## CUTSINGER *v.* CITY OF ATLANTA *et al.*

1. The business of keeping a hotel, lodging house, or rooming house is one so far affecting the public health, morals, or welfare that it is competent for the legislature, in the exercise of the police power, to authorize municipal authorities to require persons conducting such a business to obtain a license.

2. The conferring by the legislature, in general terms, of the power to grant or refuse licenses of the character mentioned in the preceding headnote,

in the discretion of the municipal council, without prescribing the bounds of such discretion, will not ipso facto render the grant of power void as being an effort to confer arbitrary power, but will be treated as authorizing the municipal authorities to exercise a reasonable discretion in the grant or refusal of such licenses.

3. After the thirteenth section of the act approved August 19, 1912 (Acts 1912, pp. 562, 573), had provided that the keepers of hotels, lodging houses, and rooming houses in Atlanta should apply to the mayor and general council for a license, which might be granted or refused in the discretion of that body, if by the further provision that "their action in the premises shall be final" it were intended to confer arbitrary power upon the mayor and general council by declaring that even for an arbitrary or capricious use of such power there could be no resort to the courts for relief, it would be violative of the fourteenth amendment to the constitution of the United States, and also of the clause of the State constitution which declares that no person shall be deprived of life, liberty, or property, except by due process of law. If it be construed to mean that the municipal officers can use a reasonable administrative discretion in regard to the granting or refusing of the licenses mentioned (which are licenses under the police power), and that their action shall be final in the sense that no appeal lies to any other body or court for the purpose of reviewing their action, the provision will not be violative of the clauses of the State and Federal constitutions mentioned.

(a) Applying the rule that where an act of the legislature is susceptible of two constructions, under one of which it would be unconstitutional, and under the other constitutional, the latter is to be preferred, the construction last hypothetically stated in the preceding headnote will be placed upon the clause of the act under consideration.

4. While as a general rule a court of equity (or one exercising equitable jurisdiction) will not enjoin a proceeding before a recorder of a city, instituted for the purpose of punishing the violation of a penal ordinance, yet in certain cases a court having equitable jurisdiction may intervene to protect property or property rights from irreparable damage by wrongful conduct of municipal officers, although repeated prosecutions in the recorder's court, or threats thereof, may be used as a means of consummating the wrong.

5. The allegations of the petition in this case were sufficient to withstand a general demurrer, which admits the facts alleged; and it was error to sustain the demurrer and dismiss the petition.

OCTOBER 3, 1914.

Equitable petition. Before Judge Pendleton. Fulton superior court. June 10, 1913.

Helen Cutsinger, who alleged that she was a citizen of the United States, and of Fulton County, Georgia, filed her petition against the City of Atlanta, the chief of police of that city, the recorder, the mayor, aldermen, and members of council, alleging in substance as follows: On and prior to October 7, 1912, the City of Atlanta

had permitted a rooming house or lodging house to be conducted at number 115½ Decatur street. Being physically unable, at that time, to conduct it herself, she employed one Harding to conduct it for her. On the date mentioned Harding applied for and obtained a license to operate the business and conduct it for the plaintiff until she was able to take charge of it for herself. Early in January, 1913, having resumed the conduct of her own business, the plaintiff applied to the city clerk for a license, tendering him $6.25, the amount due for one quarter, in accordance with the tax ordinance of the city. The clerk declined to receive the tender or issue the license, stating that she would be compelled to file a written application therefor. While not conceding the right of the mayor and general council to pass upon such applications as to a business of this character, which was a useful and lawful business, or to deny her a license, yet, in order to be in harmony with the defendants if possible, she filed an application for a license to operate a lodging house for men only at the place named. Pending this application she was advised by the chief of police, through her counsel, that "no case would be made against her" for conducting the business until after the application had been passed on, and then only if it should be refused. She accordingly proceeded with the conduct of her business until a few days before the filing of the petition, when she was notified by a police officer, who stated that he was acting under the direction of the chief of police, that her application had been refused and she would be compelled to close, and would not be allowed longer to operate her lodging house, that if she attempted to do so she would be charged with the commission of a violation of the municipal ordinance of the city against doing business without a license, that her employees would be arrested, and that she would be carried before the recorder and tried and punished by fine or imprisonment, and that other cases would be instituted against her from day to day until she closed her lodging house. During all the time in which she has been engaged in the business she has been conducting an orderly place, catering to white male trade only, and strictly complying with the laws of the State and the ordinances of the city, and seeking to earn an honest living by the proper pursuit of a legitimate line of business. She has been persecuted, harassed, humiliated, and damaged by the chief of police by continually "flooding" her place of business with police officers and plain-

clothes detectives, without any search-warrant or other legal authority. By reason of these continued raids the business and patronage of her lodging house has been considerably and materially diminished, and her revenue has been much reduced. She caters to a class of "country white male trade," and the poorer classes of white men, many of whom pay only twenty-five cents for a bed or cot. Such men are easily intimidated and alarmed at police raids and illegal searches, and they either leave or do not return to her place of business; and she is also humiliated, disgraced, and mortified by such continued illegal and unwarranted action on the part of the police officers under the direction of the chief. She has had as many as ten policemen in her house at one time. A squad of "plain-clothes men" will suddenly enter her house; the officer in command will take charge of the front door, the only place of exit, and will send his force from room to room searching the house. These police squads have taken possession of her lodging-house register and have gone from room to room and asked the occupant of each bed or room his name, waking them if necessary, and seeing if they were in the proper room, and if their names corresponded to the names on the register. To the best of her knowledge and belief, at none of these times has there been any warrant of any kind or character for such action. She has protested against these raids, but has been advised that she had better submit without comment and allow such persecution, as it would be necessary for her to have the permission of the chief of police in order to procure her license, and that he would oppose her obtaining the license if she did not submit. She filed her application for the license on January 3, 1913, but the council did not refuse it until March 6 following. During that period her place of business has been under constant police surveillance and subject to frequent raids, and at no time has there been a single complaint of any violation of any City, State, or Federal law by her or any occupant or patron of her lodging house. Although she has conducted her business at the place mentioned for months, and in absolute compliance with the law and all police regulations, and has submitted to the police raids mentioned, nevertheless she is advised by a representative of the chief of police that she must close her place of business and yield her right to make an honest living, "unless she meekly submits to the will of the chief of police, J. L. Beavers, who, petitioner believes,

is responsible for the denial of her application for license by the mayor and general council of the City of Atlanta." Her lodging house is located near to the police headquarters and within two blocks of the call-office of the police department. On March 23, 1913, the chief of police went in person to her place of business, took charge of her register, instructed an officer who accompanied him to take the names of men who had registered therein, ordered her to allow no one else to register, and to close up her house, and served her with a copy of charges to appear at the recorder's court for violating the rooming-house ordinance. A case was docketed against her, which is now pending. "Your petitioner is advised and believes that said chief Beavers, although he knew that he had used every endeavor possible to find your petitioner violating some law or ordinance, and had failed, yet wrote the police committee of the general council, to whom this application was referred, and recommended to them that the application of petitioner be denied." The action of the chief of police in making this case and in threatening to make other cases from day to day is based upon an amendment to the charter of the City of Atlanta, enacted by the legislature in 1912 (Acts 1912, p. 573, sec. 13), which reads as follows: "That the Mayor and General Council be and they are hereby authorized to regulate hotels, lodging houses, dance halls, rooming houses, and similar places, and they are further authorized and empowered, by ordinance, to require all person or persons owning or operating such hotels, houses, or halls to apply for a license for the operation of same, and such license may be granted or refused in the discretion of the Mayor and General Council, and their action in the premises shall be final. For a violation of such ordinance or the operation without a license granted, as herein provided, any person or persons adjudged guilty thereof in the Recorder's Court shall be subject to a sentence to pay a fine of not exceeding five hundred dollars, or to work on the public works of the city for not exceeding thirty days, either or both in the discretion of the recorder." Under this the mayor and general council adopted an ordinance the first section of which reads as follows: "Be it ordained by the Mayor and General Council, that any person, firm, or corporation desiring to open or operate a hotel, lodging house, dance hall, rooming house, or similar place shall, before opening or operating such house or place, file a petition for a license, addressed to the Mayor and General Council. If said license is granted, then the City Clerk is author-

ized to issue and receipt for a business license for such house; but if such license is refused, then such business license shall not be issued, and it shall be unlawful for any person, firm, or corporation to operate such house or place." The second section imposed a penalty upon "any person, firm, or corporation owning or operating any hotel, lodging house, dance hall, rooming house, or similar place, without being granted a license therefor by action of the mayor and general council." Under this ordinance the defendants are now seeking to close her house, stop her business, and involve her in a multiplicity of criminal prosecutions. The application which she filed was referred to a subcommittee of the general council, known as the police committee, though without notice to her. She is advised and believes that the chief of police, "by private official letter" to the chairman of the police committee, without notice to her, undertook to prejudice the chairman and other members of the police committee, and through their report the mayor and general council, against granting the application of the plaintiff, and, to the best of her knowledge and belief, undertook privately in personal conversation to influence the members of the police committee to make an adverse report upon her application, without giving her the privilege of knowing the reasons assigned for such action on the part of the committee, or an opportunity to be heard upon them and to reply thereto. At one time her counsel happened to be present at a meeting of the committee and spoke to them in relation to her application, but she is not advised as to whether the committee had passed adversely upon it at that time or not. At that particular meeting the chief of police was present, but offered no public objection to the application, and no notice was given or opportunity for her or her counsel to answer any objection at that meeting. The entry upon the application shows an adverse report by the committee, dated January 20, but it was not passed upon by the council until March 6. She is advised and believes "that said police committee met in secret session about half an hour before the meeting of the general council, and, upon the information, not under oath, of the said chief Beavers, adversed or passed unfavorably upon the petition or application." The action of the general council followed the recommendation of the police committee, without any investigation on the part of the general council; and under the ordinances of the city she would not have been permitted to be present and to have discussed the merits of

her application, and the only method of reaching the city government was through its police committee. She is a woman of mature years, now past middle life. On account of her great weight (two hundred and eighty-six pounds), and on account of her having undergone several surgical operations, she is unable to do manual labor or remain long standing upon her feet. She is familiar with the lodging-house business, and it is practically the only business with which she is familiar and which she is physically able to carry on. She has built up a sufficient business to support herself reasonably, and the name and good will of her business at the location mentioned is an intangible but valuable asset. There can be no reason for any denial of a license to operate a lodging house at this location. The place is located on the second floor of a building, with a stairway entrance to the street, and affects and injures no one; but the location is one where a hotel or lodging house of a cheap character is needed to accommodate a class of poor laboring men working in that locality, and men from the country who have come to town for the sale of their goods and the purchase of merchandise. The business was in operation at the time of the passage of the ordinance above mentioned, and the plaintiff had made large investments in furniture, in papering and painting of walls and woodwork, in carpeting of floors, halls, and steps, and in the installation of gas and electric fixtures and equipment. Practically all of this expenditure will be lost if she is compelled to cease doing business, as well as the name and good will of her business. "Petitioner is advised and believes, that, owing to the antagonistic attitude of the chief of police toward her, she will not be allowed by the mayor and general council of the City of Atlanta to have any license to operate a lodging house at any other point available to her in the City of Atlanta, and that her rights and her experience in the lodging-house business are forever lost to her, as far as being able to use the same in the City of Atlanta." The patronage of a lodging house is affected by so many considerations that it is impossible to estimate the damages which would result from a destruction of the business. To press the proceeding in the recorder's court would expose her to humiliation, embarrassment, expense, and possibly to temporary confinement, should it become necessary for her to have the action of the recorder reviewed by certiorari; and this might continue for months before the case could be heard. The

plaintiff, having no real estate, and not being allowed to continue her business, could in all probability procure no bondsman, but would be compelled to languish in jail, and in the meantime her property, her business, would be destroyed; and even though she should ultimately win, the victory would be an empty one, and she would be discharged from jail without a vestige of property left. The multiplicity of the threatened quasi criminal cases would bankrupt her in the payment of counsel fees and other expenses. "Such action amounts to nothing more or less than absolute confiscation of the property of petitioner and her utter ruin financially and in a general business in the said City of Atlanta." She will therefore be irreparably damaged, and have no legal remedy or redress. "Your petitioner shows that said criminal prosecutions now threatened to be continued are obviously nothing but a circuitous method of depriving petitioner of her property and property rights in said business, and are nothing more than an attempt by the municipal authorities of the City of Atlanta, under the pretense of seeking the good of the portion of society entrusted to their supervision, are in fact attacking the vested rights, property rights, of your petitioner." The threatened repeated prosecutions, under color of municipal ordinances, if not prevented, will practically destroy her vested property rights; "and said criminal prosecutions are a wresting of the criminal side of the law from its legitimate purpose, in matters to which they do not properly apply, and are used merely as a cloak to hide the effort to prevent petitioner from engaging in her useful and lawful occupation." The act of the legislature above quoted is unconstitutional as being in violation of the fourteenth amendment of the constitution of the United States (Civil Code (1910), § 6700), in that it attempts to vest in the mayor and general council the arbitrary right to abridge the privilege of the plaintiff to do business, and thus denies to her due process of law and the equal protection of the laws. The ordinance is unconstitutional for the same reason; as is also the action of the mayor and council. The act of the legislature and the ordinance based upon it are also in conflict with the provision of the State constitution which declares that "Protection to person and property is the paramount duty of government, and shall be impartial and complete" (Civil Code (1910), § 6358). They also violate the provision of the State constitution that "no person shall be deprived

of life, liberty, or property, except by due process of law" (Civil Code (1910), § 6359). The act of the legislature and the ordinance are unreasonable, and seek to invest the mayor and general council with arbitrary power, with no rule or regulation to guide it, or to prescribe terms for its exercise, or put any limitation upon it, and without prescribing any terms or conditions upon which a permit or license can be obtained, or allowing any appeal from the decision of the general council, or prescribing any rules of procedure. Even if discretion is lodged in the municipal authorities, it has not been fairly administered, but has been arbitrarily and grossly abused, amounting to a discrimination against her and an oppression of her as a citizen, and it is being capriciously exercised in an arbitrary manner. In fact the abuse of discretion amounts to a failure' to exercise municipal discretion, and to an arbitrary undertaking to exercise unlimited power, without recognition of the rights of the plaintiff, and without giving to her an opportunity to be heard in her own behalf. She is willing to submit to any reasonable regulations that do not amount to a prohibition or a confiscation of her property and civil rights, and she offers to submit to any reasonable rule and regulations the court may impose. She prays that an injunction be granted to prevent the defendants from interfering with the operation of her business, or proceeding with quasi criminal prosecutions against her.

The defendants demurred to the petition, on the grounds that no cause of action was set out; that it undertook to enjoin a criminal prosecution by equitable procedure; that it appeared that the city was authorized to grant or reject the application for license and that it had rejected the same, and no injunction should be granted against the further prosecution of the plaintiff; and that no grounds of equitable interference are set out. The demurrer was sustained, and the plaintiff excepted.

*William M. Smith,* for plaintiff.

*James L. Mayson* and *William D. Ellis Jr.,* for defendants.

LUMPKIN, J. (After stating the foregoing facts.)

1. The police power to grant licenses by which one person can conduct a certain business and another can not, or by which a business may be conducted at a certain place and not at another, necessarily involves some discrimination for the public welfare. Such licenses have been broadly grouped into four classes:    (1)

Where promiscuous or indiscriminate freedom to act will disturb public order or interfere with the common use of public places. A type of this class is in regard to permitting the use of the public streets for parades or processions, which may impede public traffic or cause serious collisions if all be allowed the privilege; or the granting of permission to a street railway to lay its tracks in a street, which does not require the same permission to be granted to all other similar companies to the exclusion or injury of the general public. (2) Where an occupation is offensive to comfort or endangers public safety, it may be so restricted as to locality or the manner in which it shall be conducted as not to cause injury. Chemical factories and slaughter-houses furnish examples of this class. (3) In some occupations the lack of personal qualifications or competence causes the danger to the public, and requires to be guarded against. Doctors, dentists, and plumbers are illustrations of this class. (4) Some occupations are held to be such as to involve danger to the public peace, order, or morality, and therefore to be proper subjects for regulation or licensing so as to prevent injury to the public. This is sometimes done by regulating the manner in which the business shall be conducted, and sometimes by means of a license law, so as to see that the business does not fall into the hands of persons of such evil character or reputation as might cause harm to the public. Pawnbrokers and junkdealers illustrate this class, where the grant of a license to a lawbreaker or thief might open the door to making the place one for the reception of stolen goods. In the first two classes the basis of distinction is objective, that is, based on the nature or character of the business; in the last two they relate rather to the person. Freund on Police Power, § 639. This classification, and these illustrations, not declared to be exhaustive, refer to the police power generally, and not particularly to that granted to towns or cities.

In the growth of municipalities, where the population becomes dense, and new relations and new dangers arise, for the common welfare and protection more extensive power to cope with the new situation becomes necessary,—power to prohibit certain evils and to meet certain dangers. Hence arises the grant of power to regulate, prohibit, or license certain businesses within the municipal limits (in the proper sense of the word "license," as distinguished from the imposition of a license tax for revenue). The authorities

recognize some businesses as proper subjects of police licenses, but doubt or deny whether others can be declared to be illegal unless permitted. We need not discuss the difference. Suffice it to say that the keeping of lodging houses or rooming houses is a business so far affecting the public interest as to authorize the grant of legislative authority for its regulation and licensing, in order to see that such houses do not become places for the practice of vice or crime or menaces to the public welfare. Munn *v.* Illinois, 94 U. S. 113, 129 (24 L. ed. 77); Bostick *v.* State, 47 Ark. 126 (14 S. W. 476).

2. In regard to conferring upon city officials a discretionary power to grant or refuse licenses in those cases which are proper subjects of police licenses, there are two lines of authority. One holds that there should be some uniform rule of action prescribed, governing the exercise of the discretion; and that the conference of a general discretion without this, at least as to occupations not subject to be wholly prohibited, is invalid as conferring arbitrary power. City Council of Montgomery *v.* West, 149 Ala. 311 (42 So. 1000, 123 Am. St. R. 33, 9 L. R. A. (N. S.) 659, 13 Ann. Cas. 651). The other class of decisions holds, that, as it is sometimes difficult for the legislature in advance to prescribe all of the conditions upon which the license shall be issued, it is competent for them to confer upon a municipal council the power in general terms, it not being presumed that this is intended to confer power to act arbitrarily, or that the authorities will so act. 2 Dill. Mun. Corp. (5th ed.) § 598 and citations. In some of the cases the ordinances under consideration appear to have been adopted by virtue of what is called the general welfare clause in municipal charters, and the discussions were based on the general requirement that municipal ordinances must be reasonable. In others the direct question of the constitutionality of such ordinances or acts was passed upon.

Judge Dillon says: "Where the legislature, in terms, confers upon a municipal corporation the power to pass ordinances of a specific and defined character, if the power thus delegated be not in conflict with the constitution, an ordinance passed pursuant thereto can not be impeached as invalid because it would have been regarded as unreasonable if it had been passed under the incidental power of the corporation, or under a grant of power general in its nature. In other words, what the legislature distinctly

says may be done can not be set aside by the courts because they may deem it to be unreasonable or against sound policy. But where the power to legislate on a given subject is conferred, and the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid." 2 Dill. Mun. Corp. (5th ed.) § 600. Some occupations are of such a character that they may be prohibited altogether. The one most frequently before the courts is that of selling intoxicating liquors. There are other occupations which can not be prohibited, though they may be regulated. 2 Dill. Mun. Corp. (5th ed.) § 666. So there are certain things which a person has no inherent right to do, such as using the public streets or places for purposes other than their normal use. Some of the decisions, in upholding the grant of general discretionary powers, have taken note of the distinction between things which might be prohibited, and those which could not be. But others have not done so.

In the case at bar, the business of keeping lodging houses is a legitimate business. The power to regulate and license it is conferred by express legislation. The question therefore arises upon the validity of the act of the legislature. In City of Buffalo *v.* Hill, 79 App. Div. 402 (79 N. Y. Supp. 449), an ordinance was adopted under a charter power to regulate and license the sale of meats. The ordinance provided for the issuance of a license by the mayor upon direction of the council after a two-thirds vote. Spring, J., in delivering the opinion of the court, said: "The right of the individual to carry on any gainful, lawful occupation without municipal interference unless conducted in a manner detrimental to the public is guaranteed to him as one of his inalienable prerogatives. On the other hand, the right of the legislature, and by its delegation the municipality, to enact laws or ordinances for the preservation of the public health, even though individual loss results, is a necessary power incident to the government of cities. The maxim salus populi lex suprema est is more than a mere sentiment, and has become one of the props of the police power, an elastic mantle whose ample folds cover much municipal legislation which finds no other justification. Between these two clashing principles it is often difficult to determine when the action of the municipality transcends its powers and transgresses upon

the rights of the individual." And see Davis *v.* Massachusetts, 167 U. S. 43, 17 Sup. Ct. 731, 42 L. ed. 71 (an ordinance prohibiting the making of any public address upon public grounds, except in accordance with a permit from the mayor) ; Wilson *v.* Eureka City, 173 U. S. 32, 19 Sup. Ct. 317, 43 L. ed. 603 (a prohibition against moving any frame building over any of the public streets or squares, without the written permission of the mayor) ; Gundling *v.* Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. ed. 725 (an ordinance requiring certain things to be done in regard to an application for a license to sell cigarettes; and providing that "if the mayor shall be satisfied that the persons before mentioned are of good character and reputation and are suitable persons to be entrusted with the sale of cigarettes, he shall issue a license") ; Reetz *v.* Michigan, 188 U. S. 505, 23 Sup. Ct. 390, 47 L. ed. 563 (an act providing for the determining by a board of registration of the qualification of persons seeking to practice medicine) ; Fischer *v.* St. Louis, 194 U. S. 361, 24 Sup. Ct. 673, 48 L. ed. 1018 (an ordinance prohibiting the maintaining of a dairy and cow stable in the city, without having first obtained permission so to do from the municipal assembly; which ordinance was authorized by a statute declaring that the mayor and assembly were authorized to prohibit the erection of cow stables and dairies within prescribed limits and to remove and regulate the same) ; Lieberman *v.* Van de Carr, 199 U. S. 552, 26 Sup. Ct. 144, 50 L. ed. 305 (a section of the sanitary code of New York, providing that no milk should be received, held, or kept, either for sale or delivery, without a permit in writing from the board of health, and subject to the conditions thereof, and declaring a violation of the section to be a misdemeanor). From these decisions it will appear that the Supreme Court of the United States has held that the conferring of discretionary power to grant or refuse licenses, in occupations subject to police licenses, is not per se in violation of the fourteenth amendment to the constitution of the United States, on the ground that the exact terms on which the discretion is to be exercised are not prescribed. In some of these cases the occupation or act involved was such as might have been prohibited altogether, but that fact was not always relied on in the decisions. In the last case cited, however, the business under consideration was that of selling milk, which was not of the character mentioned. The decisions of that high court are binding as to the

Federal constitution; and we think that in the present instance it is better to follow them in construing the similar "due-process clause" of our State constitution. Whether it would not be fairer and more just, as far as practicable, to prescribe in advance the requisites for obtaining a license, so that they may be known to one desiring to apply, is not the question. We are here dealing with a direct act of the legislature and its constitutionality. Is this power an arbitrary and unlimited one? Arbitrary and absolute power in municipal officers over persons and property is not an American institution; nor is it consonant with constitutional government. In the celebrated case of Yick Wo *v.* Hopkins, 118 U. S. 356, 369 (6 Sup. Ct. 1064, 30 L. ed. 220), Mr. Justice Matthews said: "When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. . . For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery." In times of peace and prosperity, when the struggles of the past against the evils arising from the abuse of power are partly forgotten, or recalled only as historic events, there is sometimes a restlessness and impatience with constitutional guaranties and restraints; but the framers of the constitution placed them in that instrument, not as mere glittering generalities, but as profound and lasting safeguards against the dangers of arbitrary power. Among them were the statements that "protection to person and property is the paramount duty of government, and shall be impartial and complete," that "no person shall be deprived of life, liberty, or property, except by due process of law;" and that "no person shall be deprived of the right to prosecute or defend his own cause in any of the courts of this State, in person, or by attorney, or both." Sometimes the discretion conferred in regard to granting licenses has been loosely called "judicial." If it were really so in the sense of being a judgment of an inferior judicatory, another section of our constitution would confer on the superior court the right to review the judgment by writ of

certiorari.  Civil Code (1910), § 6514.  We think that such was
not the intent of the act under consideration, but to confer min-
isterial discretion.

For an arbitrary abuse of such power has the citizen no recourse
in the courts?  The authorities above cited do not sanction the
conferring of arbitrary authority or its exercise.  On the contrary,
they sustain the general grant of discretionary power to issue
licenses under the police power (certainly as to things which can
not be prohibited, as the sale of whisky can be), on the ground that
it does not seek to confer arbitrary power, and that if the power is
sought to be arbitrarily and wrongfully exercised, the courts will
apply a remedy.  In City of Buffalo v. Hill, 79 N. Y. App. Div.
402, supra, it was said:  "It will be observed that in some of the
cases adverted to, the test upon which the discretion of the mayor
was to be exercised was defined in the act or ordinance creating the
authority, while in others there was no limitation placed upon it.
It does not follow that the omission to prescribe the bounds of the
authority carries the conclusion that it is vested arbitrarily in the
official or body to whom it is committed.  The difficulty of defin-
ing, in a given case, what standard shall be applied in the dispo-
sition of the petition, and the fact that the conservation of the
public health is the basis for the existence of the authority, in-
dicate the reason for the absence of the definition, but it is no
warrant for the inference that the power is an arbitrary one to be
exercised in ruthless disregard of the rights of any class or in-
dividual."  And again (p. 409):  "While it is unnecessary for us
to pass upon the question of the power of the court to review a
flagrant abuse of discretion by the common council, suffice it to
say that if a case of that kind were properly presented the court
would doubtless not lack the ability to find some effective way to
reach it for condemnation."  In Yick Wo v. Hopkins, 118 U. S.
356, supra, Mr. Justice Matthews said (p. 373):  "Though the
law itself be fair on its face and impartial in appearance, yet, if it
is applied and administered by public authority with an evil eye
and an unequal hand, so as practically to make unjust and illegal
discriminations between persons in similar circumstances, material
to their rights, the denial of equal justice is still within the pro-
hibition of the constitution."  This, he said, was true, whatever may
have been the intent of the ordinances as adopted.  In other words,

the ruling seems to be that the ordinance itself might be unconstitutional, or that there might be an unconstitutional administration of it by the public authorities, so as to deprive a person of constitutional rights; and in either event relief could be afforded.

In Reetz *v.* Michigan, 188 U. S. 505, supra, while the expression was used by Mr. Justice Brewer that the court knew of no provision of the Federal constitution which forbade a State from granting to a tribunal, whether called a court or a board of registration, the final determination of a legal question, if nothing in the State constitution prevented so doing, it is evident that he merely meant that there need be no provision in the statute for an appeal or certiorari, or like method of review, to satisfy the requirements of the constitution of the United States. He clearly did not mean that arbitrary and capricious action violative of constitutional rights was beyond remedy by the courts; for he distinctly said (p. 508-9): "But while the statute makes in terms no provision for a review of the proceedings of the board, yet it is not true that such proceedings are beyond investigation in the courts."

In Lieberman *v.* Vandecarr, 81 App. Div. 128 (80 N. Y. Supp. 1108), a section of the sanitary code of New York prohibiting the keeping or selling of milk without a permit from the board of health was attacked as unconstitutional, on the ground that it conferred arbitrary power on the board. The Appellate Division of the Supreme Court of New York held that it was not intended to confer such absolute and arbitrary power in the selection of those who might and those who should not sell milk, but only the power to exercise a reasonable discretion. In the opinion it was said: "Such regulations, however, should be uniform, and the board should not act arbitrarily; and if this section of the sanitary code vested in them arbitrary power to license one dealer, and refuse a license to another similarly situated, undoubtedly it would be invalid: Yick Wo *v.* Hopkins, 118 U. S. 356 [supra]; Gundling *v.* Chicago, 177 U. S. 183 [supra]; Noel *v.* People, 187 Ill. 587 [58 N. E. 616, 52 L. R. A. 287, 79 Am. St. R. 238]; Dunham *v.* Trustees of Rochester, 5 Cowen, 462; City of Brooklyn *v.* Breslin, 57 N. Y. 591; but such was not its purpose, nor is that its fair construction." The decision of the Appellate Division was affirmed by the Court of Appeals of New York. 175 N. Y. 440 (67 N. E. 913,

108 Am. St. R. 781). On review in the Supreme Court of the United States, Mr. Justice Day said (199 U. S. 552, 559, supra) : "The Court of Appeals, affirming the decision of the Appellate Division, did not speak with equal emphasis upon this point, but it leaves no doubt that it sustained the statute as authorizing the exercise of a reasonable discretion." Accepting this construction of the State statute by the highest court of the State, the Supreme Court of the United States held that the statute was not unconstitutional; but Mr. Justice Day added (p. 562) : "There is no presumption that the power will be arbitrarily exercised, and when it is shown to be thus exercised against the individual, under sanction of State authority, this court has not hestitated to interfere for his protection, when the case has come before it in such manner as to authorize the interference of a Federal court."

In Re Jacobs, 98 N. Y. 98 (50 Am. R. 636), the Court of Appeals of New York discussed at some length the police power of the State. In the opinion Earl, J., said (p. 108) : "The limit of the power can not be accurately defined, and the courts have not been able or willing definitely to circumscribe it. But the power, however broad and extensive, is not above the constitution. When it speaks, its voice must be heeded. It furnishes the supreme law, the guide for the conduct of legislators, judges, and private persons; and in so far as it imposes restraints, the police power must be exercised in subordination thereto." The constitution of this State not only recognizes the necessary power of the courts to declare laws in violation of the State or Federal constitution void (a power already known to exist), but expressly declares it to be their duty to hold such acts void. Civil Code (1910), § 6392.

From what has been said, it will be seen that the legislature had power to confer on the municipal council authority to exercise a reasonable discretion in granting or refusing a license to one desiring to keep a lodging house or rooming house; and that the conference of this power in general terms did not ipso facto render the act void; but that the legislature could not constitutionally confer upon the council arbitrary or unlimited power, or prevent the citizen wronged by an arbitrary or capricious exercise of the power, not based on a legitimate use of discretion, from appealing to the courts to protect him from oppression.

3. The act under consideration declares : "That the Mayor and

General Council be and they are hereby authorized to regulate hotels, lodging houses, dance halls, rooming houses, and similar places, and they are further authorized and empowered, by ordinance, to require all person or persons owning or operating such hotels, houses, or halls to apply for a license for the operation of same, and such license may be granted or refused in the discretion of the Mayor and General Council, and their action in the premises shall be final." No attack is made upon the provision in regard to regulation. We have also ruled as to the power to exercise discretion in granting a license. It remains to refer to the clause "and their action in the premises shall be final." It will be noticed that the terms of the act include not only lodging houses and rooming houses, but also hotels. If the mayor and council have the power arbitrarily and capriciously to refuse a license to a lodging-house keeper, with no mode of relief, they can do the same thing as to the proprietor of a hotel. If this be so, then the continued operation of every hotel in the City of Atlanta can be made to depend upon the favor or caprice of municipal officers. One may be preferred over another without cause, and there is no remedy, if their "action is final" in the sense that there can be no resort to the courts for relief. It is no answer to this to say that the present officials may be of such character that they will not be likely to abuse the power, or that there is no presumption that this will be done. This clause is susceptible of two constructions,—one, that the grant of discretionary power, with the added provision that the action of the mayor and general council shall be final, operated to confer arbitrary power and to prevent resort to the courts for relief even in cases of arbitrary or capricious action; the other, that the section gave to the officials a reasonable administrative discretion, and provided that their action should be final in the sense that no appeal to any other body or to a court would lie to review their action, without attempting to debar the applicant from seeking the aid of the courts under proper circumstances. From what has already been said it will be seen that, under the former construction, the provision would be unconstitutional; under the latter it would not be. Under the rule that in such cases the construction which will uphold the constitutionality of the law is rather to be preferred, we adopt the second construction hypothetically stated above.

4, 5. We next come to consider the exercise of equitable juris-
diction and whether a case for it is made by the allegations of the
plaintiff. It has been announced a number of times by this court
that generally equity will not interfere with the administration of
the criminal law as such; and that the rule is ordinarily applicable
to proceedings to punish for the violation of municipal ordinances
which are quasi criminal in character. But it has also been fre-
quently added that there are exceptional cases; and it has been
pointed out that there is some difference between the State and a
municipality as to immunity from suits. The subject has been dis-
cussed in *Georgia Railway & Electric Co.* v. *Oakland City,* 129 *Ga.*
576 (59 S. E. 296); and *Mayor &c. of Shellman* v. *Saxon,* 134 *Ga.*
29 (67 S. E. 438, 27 L. R. A. (N. S.) 452). In the latter case it
was said: "In some cases, involving special facts, injunction may
be granted against the unlawful enforcement of municipal ordi-
nances, although they are penal in character, for the protection of
property or property rights or franchises against irreparable in-
jury; as, for instance, where, under the guise of enforcing a penal
ordinance, it is manifest that prosecutions and arrests are threat-
ened for the sole purpose of unlawfully taking or destroying prop-
erty, or preventing the exercise of a franchise granted by the
State."

In *Peginis* v. *City of Atlanta,* 132 *Ga.* 302 (63 S. E. 857, 35
L. R. A. (N. S.) 716), the power was claimed by the municipal
authorities of Atlanta to revoke any business tax license, and an
illegal effort was made by an ex parte resolution to declare that the
business of the keeper of a lunch counter or restaurant (who also
sold cigarettes, cigars, tobacco, and "soda-fount drinks") had been
maintained in such manner as to become a nuisance, to revoke the
license of the proprietor, and to compel him to cease business. He
showed that irreparable damage would result from closing his busi-
ness, or preventing him from continuing to conduct it, by means
of continued prosecutions or otherwise; and he prayed for an in-
junction. This court held that he was entitled to it. In the opin-
ion Mr. Justice Atkinson said: "If such power were conceded to
the city authorities, they might refuse to allow any dry goods mer-
chant, hardware dealer, hotel proprietor, confectioner, butcher, or
baker to conduct his business, by simply refusing to issue him a
business license, or might destroy his business at will, after its es-

tablishment, by revoking his license. No such arbitrary power is conferred on municipal councils or municipal authorities." It is true that the license there involved was one to raise a license tax, under the revenue power; but the decision throws light on two points: (1) that hotels were mentioned along with other useful and lawful occupations; and (2) it held that, under the facts of the case, equity would restrain an arbitrary and unlawful effort to stop the business of the plaintiff and to work irreparable damage to him, although repeated prosecutions might be used as one means of accomplishing that end. It moreover shows how far-reaching a power has been contended for by municipal authorities.

If we look to the allegations of the present petition, they set out, in substance, oppressive conduct on the part of the chief of police, strenuous and continuous efforts to find some violation of a law or ordinance on the part of the plaintiff or her lodgers, followed by failure, the perfectly proper conduct by her of the business in compliance with all laws and ordinances, and at a place unobjectionable for the purpose, the submission by her to imposition lest the chief should in revenge prevent her from obtaining a license, which was held up for more than two months, his efforts by letter and personally to prejudice the members of the committee of council, followed by arbitrary action on their part, based on no reason or investigation, and amounting to no real exercise of discretion. She further set out facts showing threats to stop her from doing business, by constant prosecutions in the recorder's court, and danger of irreparable injury to property rights. The allegations are set out in the report of facts.

The municipal authorities did not see fit to deny the allegations of the plaintiff, but relied on a demurrer, which for the present purpose admits the truth of the allegations. They may or may not appear to be true on a hearing. But we think they set out a case sufficient to withstand a general demurrer. This does not, of course, mean that an injunction will be granted if the allegations of facts are not true. If it appears that they are untrue, and that the municipal officers have exercised a reasonable discretion in the matter, the court should not enjoin them. Nor will the court take the place of the council as a licensing authority. But that is a very different thing from contending that, conceding the facts alleged, a court of equity can afford no relief against the irrepara-

ble damage which it is claimed will result from an arbitrary or capricious abuse of the power.

Counsel for the city relied strongly on the case of *Starnes* v. *Atlanta*, 139 *Ga.* 531 (77 S. E. 381). It was decided on a head-note; and the facts set out show no reference to any constitutional point, but a ruling that the facts of that case placed it within the general rule rather than within the exceptions thereto. It was argued, however, that the various constitutional points raised in the present case were also raised by the record in that case, and that the dismissal of the petition on demurrer was affirmed by this court. An examination of the record on file will show several material differences in the two cases. No effort to declare the decision of the municipal officers to be final was then before the court. The kinds of business involved were different; in the *Starnes* case it was the conduct of a sanitarium for the treatment of persons afflicted with nervous troubles and of those addicted to the liquor and drug habit; here it is the conduct of a lodging or rooming house for the accommodation of persons desiring a place to sleep. There it was charged in general terms that the municipal council acted arbitrarily in refusing a license. The general allegations on that subject were specially demurred to as vague and as failing to allege any facts in support of the general statement, and the defendant prayed that the paragraph of the petition on that subject be stricken. There was also an allegation that the ordinance was arbitrarily enforced. This likewise was specially demurred to, and it was prayed that this paragraph be stricken. The same is true as to the allegations seeking to set up irreparable injury, and those in regard to threats of numerous prosecutions. All of the grounds of the demurrer were sustained by the trial court. Such being the case, the ruling made by this court rested on different facts from those here involved. In the case now before us there was no special demurrer for want of sufficient specifications on any particular subject; but the defendant relied on a general demurrer. There is a difference in what will withstand a general demurrer and what will be good as against a special demurrer. *Seaboard Air-Line Railway* v. *Pierce*, 120 *Ga.* 230 (47 S. E. 581). Here also there were much more specific allegations of fact on the subjects mentioned, of arbitrary action and irreparable damage to property rights.

Of the case of *Neall* v. *Atlanta,* 141 *Ga.* 31 (80 S. E. 284), it need only be said that Neall did not apply for any license, and therefore no question of arbitrary conduct in refusing to grant one arose. He claimed that his business was not within the purview of the ordinance as to sanitariums, although it was alleged that he had already been found guilty in the recorder's court. These two cases, therefore, do not control the present one.

We do not discuss cases arising on applications for mandamus, as no such point is here involved. We may only remark that our Civil Code (1910), § 5441, does not accord with some of the decisions as to the limitations upon such a proceeding. No question is raised as to the propriety of making the recorder a party.

The petition sets out a cause of action sufficient to withstand a general demurrer, and dismissing it on such a demurrer was error.

*Judgment reversed.    All the Justices concur.*