### 24658. JONES *v.* CITY OF ATLANTA.

DECIDED MAY 3, 1935.

*J. K. Jordan, J. H. Rogers, G. G. Finch,* for plaintiff in error.
*J. L. Mayson, C. S. Winn, J. C. Savage,* contra.

GUERRY, J. The defendant was convicted in the recorder's court of the City of Atlanta of operating a curb market on Washington street in that city. It appears that he made application for a per-

mit to operate such market and tendered to the city in cash the license fee, and a permit was refused him. It was shown that a permit was issued to others in the immediate vicinity to conduct a similar business. He was tried for and convicted of a violation of the following ordinance:

"Whereas, the presence of curb markets has grown to be a nuisance in many sections of the city where they are now located, and Council should pass upon these locations frequently in order to protect the communities from such nuisances; therefore be it ordained by the Mayor and General Council as follows:

"Section 1. That operators, owners, and managers of curb markets shall obtain a permit from the Council every six months, beginning with the first day of July, 1933, meaning by this that on or before that date the operators, managers, or owners of curb markets in the City of Atlanta shall apply and obtain the approval for the operation of these places and shall thereafter each six months from that date secure such a similar approval."

"Section 3. All owners, operators, or managers of curb markets shall make an application to this body, giving the name of the owners, or manager of such curb markets, and the location of the same, together with the size of the market incorporated therein or used in connection therewith. Said application shall state whether or not a permit has heretofore been granted for such curb market, and shall give such other information as may seem advisable to the applicant. When this permit has been filed it shall be referred to the City Planning Commission, who shall give notice in a newspaper of general circulation in the city, the time and place of meeting for the consideration of same. After said hearings, upon such applications, the Commission shall report its findings to the Police Committee for their consideration. Before the Commission holds public hearings on such matters, it is the duty of one or more investigators from the Police Department, jointly with one or more investigators from the office of the Commission, to make a survey of conditions surrounding such locations, and to report jointly to the Commission at its hearings and the Police Committee at its hearings. After said hearings, upon such applications, the Police Committee shall report back to this body their findings either for or against the grant of permit for the operation of said curb market or markets, and Council shall thereupon take final action upon same.

"Section 4. For the purpose of this ordinance, curb markets defined as follows: Those markets established upon vacant lots or parts of lots, or on vacant portions of lots in front or rear of buildings, for the sale of produce, fruits, meats, etc., from trucks or other modes of transportation, or from boxes set upon the ground or otherwise.

"Section 5. The above language defining the things that may be sold in said markets is general and not exclusive, and in construing same, the sale of articles in or on such places, being articles which are ordinarily sold at such markets and places, are included herein."

The ordinance was attacked on the ground that it was unreasonable and void, for that it declares curb markets to be a nuisance, and for that reason grants to the mayor and council the arbitrary authority to grant or withhold the right to operate the same "without any guide or reason other than the whim or caprice of such governing authority," and thereby prevents any citizen from conducting a lawful business on his own property, however perfect or inoffensive such business may be, and because it grants authority to favor locations, rather than the character of the business operated, and tends to create a monopoly in those whose influence is sufficient to secure permits and prevents competitors from securing such permits; that it is not authorized by the charter of the City of Atlanta, that it is violative of the constitutional provision, "that private property shall not be taken or damaged for public use without just compensation being first paid;" that it deprives the owner of a curb market of his lawful business of operating the same and destroys the value of his improvements without compensation, and is violative of the due-process clause, and of paragraph 2, of article 1, of the constitution (Code 1933, § 2-102) which provides that "Protection to person and property is the paramount duty of government, and shall be impartial and complete."

The right to transact a business within realms or bounds which are not contrary to public health, safety, morals, or policy is a property right, and must be preserved to the citizen without discrimination. Code 1933, §§ 2-102, 301; *Schlesinger* v. *City of Atlanta*, 161 *Ga.* 148 (129 S. E. 861); *McIntyre* v. *Harrison*, 172 *Ga.* 65 (157 S. E. 499). A citizen's business is a property right, and as such is entitled to protection against discriminatory

or prohibitive legislation. *Schlesinger* v. *City of Atlanta; McIntyre* v. *Harrison,* supra. The power to regulate markets and provide reasonable rules for their conduct, looking to the health and safety of a city or community, is a right within the scope of municipal regulation, and the court will not look "closely into mere matters of judgment where there may be a difference of opinion," and will not interfere with the exercise of the discretion granted to municipalities upon the ground of unreasonableness, except in a clear case. "Regulations relating to markets must be reasonable, and not arbitrary or discriminatory. The regulation must have its foundation on public necessity, it must have some rational tendency to promote the public health, safety and welfare of the community." 43 C. J. p. 392. "The power to regulate does not include the power to destroy." The power to license includes the power to regulate, and the power to regulate necessarily implies the power to permit conditionally the doing of a thing. Power to regulate does not ordinarily include power to prohibit or suppress. 43 C. J., p. 250. In *Morton* v. *City of Macon,* 111 *Ga.* 162 (36 S. E. 627, 50 L. R. A. 485), it was said: "The mayor and council of a city have not . . the power to impose upon a useful and legitimate business a prohibitory tax." A municipality, where so provided in its charter, may require permits for the exercise of its power of regulation, but the grant or refusal of such permit can not be left to arbitrary discretion. 43 C. J. 257.

In the case of *Howell* v. *Board of Commissioners of Quitman,* 169 *Ga.* 74 (149 S. E. 779), it was held that the power conferred upon such municipality "To have full and complete control of the streets, sidewalks, alleys and squares of said city" gave to the city the power to enact ordinances for the convenience and safety of the public and to regulate traffic thereon, but did not give the city the power to prevent by ordinance the driving over such sidewalks of said city for the purpose of entering and selling or buying any gasoline or oil at a filling station located adjacent thereto. Such an exercise of power was a denying to the owner of the property of the right of property without due process and without providing adequate compensation for the taking or denying of this right. A filling station has been held not to be a nuisance per se. *Standard Oil Co.* v. *Kahn,* 165 *Ga.* 575 (141 S. E. 643). An act of the General Assembly giving to the City of Albany power "to

regulate garages and filling stations, butcher-pens, butcher-shops, tanyards, livery-stables, fish-stands, restaurants, or any other business in which decaying animal or vegetable matter is kept, or in which noxious odors may become dangerous and injurious to the health of the public or any part thereof, to license the same only in such localities as may be least offensive to the public, and to revoke the license for the same when they prove dangerous and injurious to health aforesaid," was held, in the case of *Reynolds* v. *Brosnan,* 170 *Ga.* 773 (3) (154 S. E. 264), violative of the due-process clause of the constitution of Georgia, and also in conflict with the provisions of the constitution in respect to the taking or damaging of private property for public use without adequate compensation therefor, "in so far as said act is interpreted . . to authorize a refusal of a permit sought by an owner of property to construct a filling-station which conforms in every way to the building regulations of the city." Unless a business may be held to be a nuisance per se, an act allowing a municipality to refuse the conduct of the same irrespective of its compliance with any regulations adopted for the proper exercise of such business, is violative of the provisions of the constitution of the State cited above. It is within the exercise of the police power of a municipality to make all reasonable rules and regulations looking to the protection, safety, and health of its citizens in the conduct and operations of any business conducted therein. It is not within the power of the municipality to refuse to allow such business conducted at all, unless it is of itself a public nuisance. Article 1, section 1, paragraph 2 of the constitution (Code 1933, § 102) declares that "Protection to person and property is the paramount duty of government, and shall be impartial and complete."

In the case of *Brown* v. *City of Thomasville,* 156 *Ga.* 260, 269 (118 S. E. 854), it appears that the city refused license to a woman to conduct a drug store and sell cigars and cigarettes, and operate a soda fount, pending the trial of her husband for a violation of the prohibition laws. The court held that as to a "useful and per se perfectly lawful occupation . . the municipal authorities . . are not vested with a discretion to grant or refuse licenses or to revoke the same at will." The case of *Eisfeldt* v. *City of Atlanta,* 148 *Ga.* 828 (98 S. E. 495), was distinguished. In that case the city refused a license to conduct a rooming house.

The court held in *Cutsinger* v. *City of Atlanta*, 142 *Ga.* 555 (83 S. E. 263, L. R. A. 1915B, 1097, Ann. Cas. 1916 C. 280), that "The business of keeping a hotel, lodging house, or rooming house is one so far affecting the public health, morals, or welfare that it is competent for the legislature, in the exercise of the police power, to authorize municipal authorities to require persons conducting such a business to obtain a license." There was evidence introduced at the hearing of the application for a license, tending to show that the rooming house conducted by applicant was of a disorderly character and conducted for immoral purposes. Judge Lumpkin in that case said: "The police power to grant licenses by which one person can conduct a certain business and another can not, or by which a business may be conducted at a certain place and not at another, necessarily involves some *discrimination* [italics ours] for the public welfare. Such licenses have been grouped into four classes: (1) Where promiscuous or indiscriminate freedom to act will disturb public order or interfere with the common use of public places. A type of this class is in regard to permitting the use of public streets for parades or processions, which may impede public traffic or cause serious collisions if all be allowed the privilege; or the granting of permission to a street railway to lay its tracks in a street, which does not require the same permission to be granted to all other similar companies to the exclusion or injury of the general public. (2) Where an occupation is offensive to comfort or endangers public safety, it may be so restricted as to locality or manner in which it shall be conducted as not to cause injury. Chemical factories and slaughter-houses furnish examples of this class. (3) In some occupations the lack of personal qualifications or competence causes the danger to the public, and requires to be guarded against. Doctors, dentists, and plumbers are illustrations of this class. (4) Some occupations are held to be such as to involve danger to the public peace, order, or morality, and therefore to be proper subjects for regulation or licensing so as to prevent injury to the public. This is sometimes done by regulating the manner in which the business shall be conducted, and sometimes by means of a license law, so as to see that the business does not fall into the hands of persons of such evil character or reputation as might cause harm to the public. Pawnbrokers and junkdealers illustrate this class, where the grant of a

license to a lawbreaker or thief might open the door to making the place one for the reception of stolen goods. In the first two classes the basis of the distinction is objective, that is, based on the nature or character of the business; in the last two they relate rather to the person." Under the ordinance here involved, curb markets as defined thereby are not per se public nuisances. They may and should be subject to regulation looking to the protection of the safety of the general public. The character of the operator of a business unless such character is dangerous to the public safety as cited in the third class spoken of by Judge Lumpkin or is an occupation which is dangerous to the public peace, order or morality of the general public is not a ground for the refusal of a license. As was said in the *Brown* case, cited supra, "The fact that one may violate any law of the State will not of itself confer upon a municipality authority to refuse or revoke a license to carry on a business which in itself is perfectly lawful, even though the licensee may be or become guilty of creating a nuisance at his place of business; since a nuisance may be abated by a proceeding brought for that purpose." The character or reputation of a person for lewdness may authorize a city to refuse a license to such person for the conduct of a hotel or rooming house. The reasons therefor are obvious. Public health and public morals and safety support such a refusal. A city would not be authorized to refuse to a person of such a character a permit or license to conduct any lawful business at all. No contention can be made that the business of selling produce is unlawful or inherently objectionable. No contention is made that such selling may not by the observance of proper regulations conform to all the requirements of public health or safety.

Regulations which are necessary to conserve the public safety are within the power ordinarily granted to municipalities, but prohibition of a property right is violative of our fundamental law. The charter of the City of Atlanta provides that the Mayor and Council may pass ordinances "and every other by-law, regulation, and ordinance that may seem to them proper for the security of the peace, health and order and good government of said city."

Unless within exception noted, such authority does not give the power to such city to refuse the conduct of a business perfectly lawful in all other respects, such as a curb market, as defined in

the ordinance itself. The Oklahoma ice manufacture cases, New State Ice Co. *v.* Liebman, 285 U. S. 262 (52 Sup. Ct. 371, 76 L. ed. 747), is declaratory of the principle that the power to regulate does not embrace the power to prohibit a business which is otherwise lawful. This is true however much sympathy we may have with the far-seeing views expressed by Justice Brandeis in his famous dissent in that case. The ordinance in the present case is discriminatory, for it allows the arbitrary granting of the permit to some and the refusal to others. It is the denial of a property right to a citizen without just and adequate compensation being paid therefor. The granting of a hearing before a commission who have arbitrary power to grant or refuse a permit is of itself a denial of the due process clause of the constitution of this State. The court erred in overruling the petition for certiorari.

   *Judgment reversed. Broyles, C. J., and MacIntyre, J., concur.*