CAREY *et al. v.* CITY OF ATLANTA *et al.*

1. Where an owner of a city lot makes a contract of sale, and, upon payment of a part of the purchase-money, executes a bond for title, and places the purchaser in possession, the obligor and the obligee are proper parties to a suit against the city to enjoin an illegal interference with the possession of the property. *Ford* v. *Commercial Industrial Co.,* 132 *Ga.* 344 (63 S. E. 1120).

2. While equity will not ordinarily enjoin a criminal prosecution (*Georgia Railway & Electric Co.* v. *Oakland City,* 129 *Ga.* 576, 59 S. E. 296), yet, where repeated prosecutions are threatened under a void municipal ordinance, and the effect of such prosecutions would tend to injure or destroy the property of the person so prosecuted, or deprive him of the legitimate enjoyment of his property, equity will entertain a suit to inquire into the validity of the ordinance, and enjoin its enforcement. *Hasbrouck* v. *Bondurant,* 127 *Ga.* 220 (56 S. E. 241); *Outsinger* v. *Atlanta,* 142 *Ga.* 555 (83 S. E. 263).

3. Sections 1 and 2 of the ordinance of the City of Atlanta, adopted June 16, 1913, and the corresponding sections of an amendment thereto, adopted November 3, 1913, prohibiting white persons and colored persons from residing in the same block, deny the inherent right of a person to acquire, enjoy, and dispose of property, and for this reason are violative of the due-process clause of the Federal and State constitutions.

FEBRUARY 12, 1915.

Petition for injunction. Before Judge Bell. Fulton superior court. March 31, 1914.

*George Westmoreland,* for plaintiffs.

*J. L. Mayson* and *W. D. Ellis Jr.,* for defendants.

ATKINSON, J. 1, 2. The rulings announced in the first and second headnotes do not require elaboration.

3. The assignment of error complained of the judgment of the trial court refusing to grant an interlocutory injunction. The controlling question is as to the constitutionality of an ordinance of the City of Atlanta which provides for the segregation of residences; the design of the ordinance being to require white persons and persons of color to reside in separate blocks. It appears from the pleadings and evidence that the ordinance was adopted on June 16, 1913, and amended on November 3, 1913. On October 1, 1913, one of the plaintiffs, a colored person, purchased a lot and house from a white person, in which the latter resided. The property was located in a block occupied by white and colored persons. A white person resided on a lot adjoining the one purchased as above mentioned. On December 9, 1913, the plaintiff above mentioned contracted to sell the lot at an advanced price to the other plaintiff, and executed a bond for title. The former white owner having moved out, the obligee in the bond for title, who contemplated taking up his future residence in the house, caused the same to be temporarily rented to a colored person, and received one month's rent. When the tenant moved in, the white proprietor of the adjoining residence objected to the occupancy of the house by a colored person, and, upon notice from the chief of police that a case would be made against the tenant under the ordinance, the latter moved out, and the plaintiff was required to refund the money paid for rent. The plaintiff was also notified by the chief of police that the ordinance would be enforced against him, or any other colored person who attempted to occupy the dwelling as a residence, upon objection being urged by the adjoining white proprietor.

The particular parts of the ordinance complained of as being unconstitutional are sections 1 and 2 of the original ordinance, and the corresponding sections of the amendment. These are alleged to be void, because they (a) deprive the plaintiffs of the use and enjoyment of their property, (b) deprive the plaintiffs of their property rights, without due process of law, and (c) delegate to individuals the right to say how the plaintiffs shall use their property. By amendment to the petition it was charged that these provisions of the ordinance were void as being violative of art. 1, sec. 1, paragraphs 2 and 3, of the constitution of this State (Civil Code, §§ 6358, 6359), which declare that "protection to person and property is the paramount duty of government, and shall be

impartial and complete;" and that "no person shall be deprived of life, liberty, or property, except by due process of law." The ordinance was also charged to be violative of the constitution of the United States, as contained in the 14th amendment (Civil Code, § 6700), which declares that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The ordinance in its entirety was as follows:

"An ordinance for preserving peace, preventing conflict and ill feeling between the white and colored races, and promoting the general welfare of the city, by providing for the use of separate blocks by white and colored people for residences, and for other purposes. . . Sec. 1. That from and after the approval of this ordinance it shall be unlawful for any white person to move into or use as a residence or place of abode any house, building, or structure, or any part of a house, building, or structure situated or located on any block as hereinafter defined in Section 4, on which block the house, building, or structures, in whole or in part, shall be occupied or used as residences or places of abode by colored persons, otherwise than as provided in Section 3 hereof. The block into which white persons are herein forbidden to move or occupy, being occupied or used by colored persons as herein set forth, shall be deemed a 'Colored Block' for the purpose of this ordinance. Sec. 2. That from and after the approval of this ordinance it shall be unlawful for any colored person to move into, or use as a residence or place of abode, any house, building, or structure, or any part of a house, building, or structure situated or located on any block as hereinafter defined in Section 4, on which block the houses, building, or structures shall be occupied or used as residences or places of abode by white persons, otherwise than as provided in Section 3 hereof. The block into which colored persons are herein forbidden to move or occupy, being occupied by white persons as herein set forth, shall be deemed a 'White Block' for the purpose of this ordinance. Sec. 3. That nothing in either of the

preceding sections shall be construed or defined to prevent domestic servants from residing in the house or building wherein they are employed or upon the same lots with the houses or buildings which they serve. Sec. 4. That the word 'Block,' as used in this ordinance, is hereby defined to mean that portion of any street or alley together with the lots abutting on same, whether or not, and upon both sides thereof, between the two adjacent intersecting or crossing streets. In case either of said adjacent streets intersect but do not cross the street upon which the block in question may be located, the lots improved or unimproved, upon the side of the last mentioned street, to wit the street facing the intersecting street, shall be included in the block between the two adjacent intersecting crossing streets, without reference to the street which runs to said block but does not cross same. Corner lots, improved or unimproved, shall be deemed located in the block upon the street on which they front or are intended to front when improved. In using the words 'lots' in this section it is intended to include the houses on same where such lots are improved. Sec. 5. That any persons violating the provisions of Sections 1 or 2 of this ordinance shall, on conviction in the Recorder's Court, be deemed guilty of an offense and be punished by a fine not exceeding one hundred dollars, or sentenced to work on the public works for not exceeding thirty days, either or both punishments to be inflicted in the discretion of the Recorder, and each day's violation of the ordinance to be considered a separate offense. Sec. 6. That, upon the approval of this ordinance, any person desiring to build or erect, for himself or as agent for another, any building or structure to be used as residences or places of abode upon property situated in any block, as defined in section 4 hereof, and within which there are no houses, buildings, or structures used as residences, or otherwise vacant property, shall, in the application for a permit to the building inspector, declare that such houses or structures for which a permit is asked are to be used as residences or places of abode for white persons or for colored persons. Upon the filing of said application the building inspector shall order the same published for two successive weeks in one of the daily newspapers of the City of Atlanta, calling particular attention to said notice, and the fact that the house, building, or structure proposed to be built or erected are to be used as residences by white people or by colored people, as the case may

be; and unless within five days from the date of the last publication thereof protest be made, in writing, to the building inspector by a majority of the property-owners in said block against the use mentioned in said notice, the permit desired shall issue, if in other respects said application be in conformity with the ordinances of the city.   Thereafter all houses, buildings, or structures erected for houses or residences or places of abode, and all houses, buildings, or structures in said block erected for other purposes, but which it may be desired to use as residences or places of abode, shall be so used, either as residences or places of abode, for white persons or for colored persons, as may be determined by the permit granted in the manner hereinbefore provided.   Any person or persons moving into or using as residences or places of abode any of such houses, buildings, or structures, or any part thereof, contrary to the classification as fixed in the manner herein provided, and set out in said permit, shall be guilty of an offense and punished in the same manner as provided in section 5 of this ordinance.   If, however, the majority of the property owners in said block in which the proposed building or structure is to be erected and for which permit is asked, as above provided, shall protest against said house, building, or structure in the manner above provided, then in such case no permit shall issue on said application for the erection of a building or house or structure for the use set out in said application.   The provisions of this section are intended to provide a method by which a block which is vacant may be improved and by which its use for either white or colored person may be determined.   Sec. 7. That wherever after the passage of this ordinance a majority of the owners of either real or leasehold property in any block which is subject to the operation of sections 1 and 2 of this ordinance shall make application in writing to the building inspector, requesting that he declare the house in said block to be open for occupancy thereafter by either white or colored persons, it shall be the duty of the building inspector to notify the board of police commissioners that said block is not longer subject to sections 1 and 2 of this ordinance, as the case may be.   Upon the filing of said application, as above provided, with the building inspector, either white persons or colored person moving into or using as places of abode or residences the houses and buildings in said block shall not be subject to the penalties provided for in this ordinance.   Provided,

however, that at any time thereafter said block shall be occupied entirely by white persons, to wit, all the residences thereof shall be either white or colored, then said block shall thereupon immediately become subject to the provisions of the other sections of this ordinance with reference to white blocks or black blocks respectively, that is, if white persons entirely occupy said blocks, then it shall thereafter be a white block, and if colored persons entirely occupy said block, then it shall thereafter be a black block and subject to the provisions of this ordinance with reference to white and black blocks.

"Amended by Alderman Nutting: Be it ordained by the Mayor and General Council, that the pending ordinance in Re Segregation of races be amended as follows: That no provisions of the foregoing ordinance shall cause any change in the status of the races as to present occupancy or ownership, and no member of either race shall be forced to move from any present location; but that entire ordinance shall be operative as to the future. That all ordinances and parts of ordinances in conflict with this ordinance be and the same are hereby repealed."

A further amendment was as follows: "That the ordinance adopted by the General Council on the 16th day of June, 1913, and approved by the Honorable J. G. Woodward, Mayor, on the 17th day of June, 1913, providing for the use of separate blocks by white and colored people for residences and for other purposes, be amended by adding thereto the following sections: Section 1. That from and after the approval of this ordinance it shall be unlawful for any colored person to move into, or use as a residence or place of abode, any house, building, or structure, or any part of a house, building, or structure situated or located except as provided in said original ordinance, which said house, building, or structure has previously been occupied by white people, and where white people are still living in houses or buildings adjoining the same, without the consent of the white people living in said adjoining house or buildings. Sec. 2. That from and after the approval of this ordinance it shall be unlawful for any white person to move into, or use as a residence or place of abode, any house, building, or structure, or any part of a house, building, or structure situated or located except as provided in said original ordinance, which said house, building, or structure has previously been occu-

pied by colored people, and where colored people are still living in houses or buildings adjoining the same, without the consent of the colored people living in said adjoining houses or buildings. Section 3. The penalty for violation of the previous sections shall be as provided in Section 5 of said original ordinance."

Under the operation of sections 1 and 2 of the original ordinance, and the corresponding sections of the amendment, the following result could be brought about: Assuming that in any mixed block—that is, one occupied by both white and colored persons—there are three adjacent lots owned by separate persons, each of whom resides on his lot, and that the proprietor of the middle lot be a white person, and that the proprietor on one side be a white person and the proprietor on the other be a colored person: if the middle proprietor should desire to move out and substitute a colored tenant, he could not do so if the adjacent white proprietor objected; or if he should sell to a colored person, the purchaser could not move into the house to reside, or substitute another colored person to do so, if the adjoining white proprietor objected. So also if the middle proprietor were a colored person and should desire to move out and substitute a white person to reside in his dwelling, he could not do so if the colored adjoining proprietor objected; or if he should sell to a white person, the purchaser could not move into the dwelling to reside, nor substitute a white tenant to do so, if the colored adjoining proprietor objected. In each of such instances an owner of property could, by mere force of the ordinance and caprice of an adjoining proprietor, without any compensation or process of law, be deprived for all time of the right to reside on his property, or to substitute a tenant or grantee to do so. The right of the owner of property to reside on it is inherent, and permanent deprivation of that right is in substance a taking of the property itself. Deprivation thereof in the manner above indicated, without any symbol of legal procedure, is opposed to the guaranty as embodied in the due-process clauses of the State and Federal constitutions. Ordinances of this character are of recent origin. The first seems to have been adopted on May 19, 1911, in Baltimore, Md., and has several times been amended. Since then several other cities have adopted segregation ordinances; and the State of Virginia has enacted a statute on the subject. A person was prosecuted for violating the Baltimore ordinance. The

defendant attacked the validity of the ordinance. The Supreme Court of the State of Maryland, in dealing with the case (State *v.* Gurry, 121 Md. 534, 88 Atl. 546, 47 L. R. A. (N. S.) 1087), discussed the constitutionality of the ordinance at length, and expressed the view that under the exercise of the police power a law of that character could be adopted, but finally decided that the ordinance was void on the ground that it was so unreasonable as to be unauthorized under the general welfare clause of the charter of the city. On this subject it was stated in the opinion that the serious objection to the provisions of the ordinance was that they wholly ignored all vested rights which existed at the time of the passage of the ordinance. This was put upon the ground that the ordinance affected the rights of an owner existing at the time of the passage of the ordinance. Relatively to them it was said: "To deny him such rights would be a practical confiscation of his property, for his house might be of a character he would not rent to a colored person; and if he could not use it himself, he would be deprived of not only the income from it, but of such use of it as is guaranteed to every owner of property by the constitution and laws of the land." While this pronouncement seems to indicate a disposition to hold the ordinance void because the ordinance was retroactive, it at the same time recognizes that the ordinance involved jus disponendi of the owner, and that that right was within the protection of the constitution. In North Carolina a person, in violation of a segregation ordinance, moved his family into a house to occupy it as a residence. He was tried for violating the ordinance, and found guilty. In the Supreme Court of that State it was ruled: "Charter and statutory authority to pass ordinances for the general welfare of the city, and such regulations for the better government of the town as the commissioners may deem necessary, does not include power to forbid members of either the white or colored race to live in any block where a majority of the residents are of the other race." State *v.* Darnell, 166 N. C. 300 (81 S. E. 338, 51 L. R. A. (N. S.) 332). As indicated by the note, the court was not passing on the constitutional question, but much of the reasoning employed in support of the proposition that the ordinance was not authorized under the general welfare clause of the charter of the municipality is pertinent and persuasive on the constitutional question. In the course of the opinion it was said: "Besides, an

ordinance of this kind, forbids the owner of property to sell or to lease it to whomsoever he sees fit, as well as forbids those who may be desirous of buying or renting property from doing so where they can make the best bargain. Yet this right of disposing of property, the jus disponendi, has always been held one of the inalienable rights incident to the ownership of property, which no statute will be construed as having power to take away. In Bruce *v.* Strickland, 81 N. C. 267, it is said: 'The jus disponendi is an important element of property, and a vested right protected by the clause in the Federal constitution which declares the obligation of contracts inviolable.' The same doctrine is fully held and discussed in Hughes *v.* Hodges, 102 N. C. 239, 9 S. E. 437, and in the numerous citations to those two cases, which will be found in the Anno. ed. This ordinance forbids a white man or a colored man to live in his own house if it should descend to him by inheritance, and should happen to be located on a street where a majority of the residents happen to be of such different race. There is no reason why the power of the county commissioners to provide for the public welfare should not be as broad as those of the town commissioners; and if, under such general authority, similar regulations are prescribed for the country districts, one who should buy or inherit property in a section where the opposite race is in the majority could not reside on his own property, and he could not sell it or rent it out except to persons of such different race, since none other could reside there. Neither a white manager nor any white tenants could reside on a farm where a majority of the tenants or hands are colored. . . There is a wide distinction between suffrage, which is not an inherent right, but which is conferred by constitutional prescription, and which is usually extended from time to time, and the inalienable right to own, acquire, and dispose of property, which is not conferred by the Constitution, but exists of natural right. There is no question that legislation can control social rights by forbidding intermarriage of the races, and in requiring Jim Crow cars, and in similar matters. It was also held in Mugler *v.* Kansas, 123 U. S. 623, 31 L. ed. 205, 8 Sup. Ct. Rep. 273, that, as the State had the right to regulate or forbid the sale of liquor, that one who had devoted his property to such purpose could not object that he is forbidden longer to so use it; but none of these interfere with the fundamental

right of every one to acquire and dispose of property by sale." It appears from the report of the case that, in addition to the cases specially mentioned in the foregoing excerpt, the court had before it Berea College *v.* Kentucky, 211 U. S. 45 (29 Sup. Ct. 33, 53 L. ed. 81), Plessy *v.* Ferguson, 163 U. S. 537 (16 Sup. Ct. 1138, 41 L. ed. 256), and many other cases on the subject of race regulations under the police power in matters concerning the administration of educational institutions, the operation of separate cars, and the like, in which it was held that the difference in the races afforded a basis for classification which would support in some instances ordinances, and in others statutes, regulating the conduct of those particular businesses. In those cases the equal-protection clause of the constitution was the one mainly discussed. In each instance the complaining person was afforded the opportunity to ride, or to attend institutions of learning, or afforded the thing of whatever nature to which in the particular case he was entitled. The most that was done was to require him as a member of a class to conform to reasonable rules in regard to the separation of the races. In none of them was he denied the right to use, control, or dispose of his property, as in this case. Property of a person, whether as a member of a class or as an individual, can not be taken without due process of law. In the recent case of McCabe *v.* Atchison &c. Ry. Co., 235 U. S. 151 (35 Sup. Ct. 69), where the court had under consideration a statute which allowed railroad companies to furnish dining-cars for white people and to refuse to furnish dining-cars altogether for colored persons, this language was used in reference to the contentions of the attorney-general: "This argument with respect to volume of traffic seems to us to be without merit. It makes the constitutional right depend upon the number of persons who may be discriminated against, whereas the essence of the constitutional right is that it is a personal one." While the police power is very broad, its limits are within the constitution. In *Cutsinger* v. *Atlanta*, 142 *Ga.* 555 (83 S. E. 263), the following was quoted with approval from the decision In Re Jacobs, 98 N. Y. 98 (50 Am. R. 636): "The limit of the [police] power can not be accurately defined, and the courts have not been able or willing definitely to circumscribe it. But the power, however broad and extensive, is not above the constitution. When it speaks, its voice must be heeded. It furnishes the supreme law, the guide for the

conduct of legislators, judges, and private persons; and in so far as it imposes restraints, the police power must be exercised in subordination thereto." In the opinion it was held: "The constitution of this State not only recognizes the necessary power of the courts to declare laws in violation of the State or Federal constitution void (a power already known to exist), but expressly declares it to be their duty to hold such acts void."

The effect of the ordinance under consideration was not merely to regulate a business or the like, but was to destroy the right of the individual to acquire, enjoy, and dispose of his property. Being of this character, it was void as being opposed to the due-process clause of the constitution; and the judge erred in refusing to grant the injunction.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*

LUMPKIN, J., concurring specially. I concur in the result reached, but not in all that is said in the opinion of Mr. Justice Atkinson. It seems to me that the discussion in regard to the right to use property as an incident to ownership may lead to extreme results. The right of an owner to use his property is important, but it is not so absolute that he may, at all times and under all circumstances, use it as he pleases, regardless of the public welfare, morals, or safety. The statute books contain many laws restricting the use of property by the owner of it, and prohibiting him from using it for certain purposes. Laws prohibiting the erection of wooden buildings within the fire limits of a city restrict the owner's use of his property, although he may contend that a wooden building which he desires to erect would be safe, and that he has not the means to build one of brick or stone. Laws which prevent an owner from using his property for the storage of dynamite, powder, oil, or other dangerous substances in populous communities, likewise place limitations upon the owner's right to use his property as he sees fit. The right to contract has been treated as a part of the liberty of a citizen, and yet it is subject to certain limitations for the public good. Thus usurious contracts have long been prohibited. Many other illustrations might be given in addition to those arising under laws relating to the segregation of the white and negro races in cars and schools. I can not subscribe to the apparent idea that classification has nothing to do with such

laws. Classification as to the particular use to which property is to be put, having in view its location and surroundings, may be an important element in considering laws of this character. In the leading case of Plessy v. Ferguson, 163 U. S. 537 (16 Sup. Ct. 1138, 41 L. ed. 256), Mr. Justice Brown, delivering the opinion of the court, said: "A statute which implies merely a legal distinction between the white and colored races—a distinction which is founded in the color of the two races, and which must always exist so long as white men are distinguished from the other race by color—has no tendency to destroy the legal equality of the two races or re-establish a state of involuntary servitude." Referring to the fourteenth amendment, he said: "The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law; but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the State legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools of white and colored children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced."

In Pace v. Alabama, 106 U. S. 583 (1 Sup. Ct. 637, 27 L. ed. 207), it was held that adultery between blacks and whites could constitutionally be punished more severely than the same crime between persons of the same race, on the ground that the white and black were punished alike, without discrimination. A law prohibiting the intermarriage of the two races has been declared valid. State v. Gibson, 36 Ind. 389 (10 Am. R. 42).

Suppose that an owner of property in the best residential portion of a city should claim the right to build upon his lot a large boarding-house or rooming-house, in which he should receive indifferently boarders of both races and sexes, producing a situation of great irritation and calculated to bring about unfortunate re-

sults. It is quite possible that the sacred right of property might be subject to regulation for the public safety (which has been declared to be the supreme law), by a reasonable pre-existing ordinance.

In Plessy *v.* Ferguson, supra, the law involved was one requiring railway companies carrying passengers in their coaches in the State of Louisiana to provide equal but separate accommodations for the white and colored races, by means of separate cars or by dividing the passenger-coaches by a partition. Such a law necessarily interfered to some extent with the right of the owner of the property to use it as it saw fit. While this law related to railway companies, the opinion of the majority of the Supreme Court of the United States was not based on that ground. On the contrary, Mr. Justice Harlan, who dissented, referred to the fact that a railway was a quasi public highway, where all might travel. Of course, regulations based on a distinction between the two races must be reasonable and not arbitrary, and the municipal council or other body making them must have authority to do so. In the present case, the petition does not distinctly make the point that the general welfare clause in a city charter does not confer authority to adopt a segregation ordinance, or aver in terms that the ordinance under consideration was unreasonable. It does, however, charge that the ordinance delegated to individuals the right to say how the plaintiffs should use their property. I think that this ground is well taken. If the residence of the two races in close proximity was a matter requiring regulation by ordinance, the legislative body should determine the fact, and not leave it to depend upon the will of individuals, perhaps the whim of a single resident, and subject to shift from time to time according to the wishes of some of those who for the time being might reside in the block, so that sometimes the block might be classified as "white," sometimes as "black," and sometimes mixed. It provides for no method for determination of the fact by legitimate authority, save as a property-owner's neighbors may wish. A similar ordinance adopted in Baltimore, which seems to have been taken as a guide in preparing the ordinance of Atlanta, was declared invalid by the Supreme Court of Maryland, although that court did not deny the right to use the distinction between the white and black races as a basis of legitimate classification.

The near approach of the end of the term, and the rush of business incident thereto, under a provision of our constitution which requires that all cases shall be decided at the first or the second term, prevents a more thorough discussion of the subject. I agree with the majority of the court that the particular ordinance here involved is unconstitutional and void. But I think the line of reasoning adopted by them may carry them too far.