HOLCOMBE *et al. v.* GEORGIA MILK PRODUCERS CONFEDERATION *et al.*

No. 12757.   JUNE 17, 1939.

*Hirsch & Smith, M. J. Yeomans, attorney-general, Duke Davis, assistant attorney-general,* and *Augustine Sams,* for plaintiffs in error.

*Swift, Pease, Davidson & Swinson,* and *Morgan Belser,* contra.

REID, Chief Justice. The present proceeding brings into question the constitutionality of the act of the General Assembly, commonly referred to as the milk-control law. Ga. L. 1937, p. 247. This court upheld the act, in *Bohannon* v. *Duncan,* 185 *Ga.* 840 (196 S. E. 897), and in *Gibbs* v. *Milk Control Board of Georgia,* 185 *Ga.* 844 (196 S. E. 791), against certain constitutional attacks made in those cases.

The Georgia Milk Producers Confederation, a non-profit co-operative marketing association organized and incorporated under the laws of the State of Georgia, M. A. Cloudt and others, styling themselves as consumers, and two other persons classified as store operators presented to the judge of the superior court their petition for injunction against the members of the milk-control board, appointed and functioning under the provisions of the act. The defendants demurred to the petition. The petition was several times amended. The demurrers were overruled, and exceptions were taken.

The act is comprehensive, and contains extensive and elaborate provisions for regulating the production, distribution, and sale of milk. It provides for the creation of a milk-control board, for the appointment of its members, fixes their duties, defines the powers of the board, and defines the milk product in its various forms. It defines and classifies those engaged in its manufacture, sale, and distribution. It provides for issuance and revocation of licenses to those engaged in the handling of the product, and for license fees, and penalties for violation of regulations; and finally undertakes, as its objective, "to provide for them [consumers] an adequate supply of wholesome milk."

Section 5 of the act is as follows: "Milk Sheds. Upon its organization, the board shall designate natural marketing areas within the State, each of which shall constitute a milk shed, and the board may, from time to time thereafter, designate additional milk sheds or combine two or more milk sheds in which this act is effective. After the designation of any milk shed and upon petition to the board therefor, the board shall hold an election within such milk

shed to determine whether or not the provisions of this act shall be made applicable within such milk shed. Each producer, producer-distributor, and distributor having a municipal or county permit to sell milk within the milk shed shall be entitled to one vote only. If, in any such election, a majority of the votes cast shall be favorable thereto, the provisions of this act shall thereupon apply within such milk shed and shall remain in force throughout the remaining life of this act. The board shall advertise each such election, and make reasonable rules governing the conducting thereof. The decision of the board as to the results of any such election shall be final; but the provisions of this act shall not apply within any part of this State except within any milk shed wherein a favorable election has been held as provided in this section." By various provisions the milk-control board is vested with authority to administer and enforce the terms of the act. Section 19 provides that the board may, after public hearing, determine what prices for milk in the particular milk sheds where the act is made applicable will be sufficient to insure an adequate supply of wholesome milk to the public, having a special regard for the health and welfare of children and the general public interest. Among the conditions which this section imposes upon the board is that of taking into consideration, in fixing these prices and in determining what would be a reasonable return to the producer, the matter of costs in maintaining dairy animals in a healthy condition, providing necessary sanitary equipment and methods, taking also into consideration wages to be paid, and things of that nature. Provision is also made in the act for a review of the findings and judgment of the board as in other cases provided by law.

All of these provisions are elaborately stated in the act, and for the most part only referred to above. They follow section 1, which undertakes to state a "Declaration of Legislative Policy" as follows: "As a matter of legislative determination, it is hereby declared that milk is a necessary article of food for human consumption; that the production and maintenance of an adequate supply of healthful milk is vital to the public health and welfare; that uneconomic practices in the production, transportation, processing, storage, distribution, and sale of milk within the State of Georgia constitute a constant menace to the health and welfare of the inhabitants of this State and undermine sanitary regulations and standards of

content and purity; that, even with stringent enforcement of sanitary regulations, these uneconomic practices threaten seriously to impair and ultimately to destroy the supply of wholesome and healthful milk for adults and children within this State; that these facts have created an emergency situation; and that, to preserve the health of the people of this State, it is necessary in this emergency and in the public interest that the distribution and sale thereof be regulated as provided herein."

The last section of the act provides that its terms shall apply only during the "emergency period" which is defined therein as being that period between the time the act. takes effect and August 15, 1941.

It is contended that the act as enforced against the complainants is contrary to the constitution of Georgia, (1) because it deprives certain of the complainants of their property without due process of law, in those provisions which require them "to pay illegal exactions called license fees;" (2) because it violates the equal-protection clause of the constitution, in that its provisions are made operative in a particular milk shed only by means of an election, which it is claimed is discriminatory as to the consumers of milk and the complaining store operators, because they are not permitted a voice in said election as to determining whether the act shall be applicable in the particular area of that milk shed; (3) because it violates article 1, section 5, paragraph 1, of the constitution, in that it assumes to regulate, control, and fix prices in the milk industry, which power "is a power reserved by the people, and not surrendered by them to the State;" (4) because the act violates article 3, section 1, paragraph 1, of the constitution, which provides that the legislative power of the State shall be vested in the General Assembly. It is claimed that the terms of the act which provide that it shall be operative only in those areas called milk sheds where it is shown that a majority of the producers, distributors, and producer-distributors by vote so determine offends the above section of the constitution, in that it is an illegal delegation of legislative power, and that this delegation of power extends to only a limited number and to a limited classification of those to be affected by its provisions. It is also charged that the act violates corresponding provisions of the Federal constitution as to due process and equal protection of the laws.

■ We must first dispose of the contention by the defendants that the present action is one against the State, and since the State has not consented it can not be maintained. It is, of course, conceded that if it be in its true sense an action against the State, this position would be well taken. The latest expression of this court as to the nature of actions against the State will be found in the case of *Roberts* v. *Barwick,* 187 *Ga.* 691 (1 S. E. 2d, 713). The well-established principle that the State can not be sued without its consent was there reiterated. In the present case, as might be expected, it is not the existence and statement of the rule upon which the parties are at issue, but only its application to the facts as presented by the petition. The rule is based upon a sound public policy, that it is neither becoming nor convenient that a State, exercising sovereign powers, should be summoned as a defendant to answer the complaints of private citizens, or that the course of its public policy or the administration of its public affairs "should be subjected to and controlled by the mandates of judicial tribunals without their consent, and in favor of individual interests." We are of the opinion that the following language taken from the brief of defendants in error sufficiently illustrates that this case falls into that classification of actions of which *Dennison Mfg. Co.* v. *Wright,* 156 *Ga.* 789 (120 S. E. 120), is a notable example: "It should be kept in mind that the action in the court below was instituted against the 'defendants as individuals who, under color of the authority of an unconstitutional, void and invalid act, to wit, the Georgia milk-control act of 1937, have committed and are committing personal trespasses and wrongs to complainants and to the property of complainants.' It is further averred . . that 'references will be made in this bill to certain acts of the defendants performed in their official capacities under said act, but such references are to be construed as meaning acts performed *under color of but without lawful authority.*" (Emphasis supplied.) It was in the *Dennison* case contended that the act under which the comptroller-general was proceeding was wholly void as being unconstitutional, and therefore that the suit against him proceeded against him as an individual and sought to enjoin him from committing acts which it was contended would amount to a personal trespass against the complaining party, because said acts would be entirely without constitutional authority. In agreeing to that con-

tention and making it the rule in that case, the following language was used: "The action in this case is not one against the defendant in his official capacity and to enforce a liability against the State, but is one against him individually for an act which, while done in his official capacity, was wholly without lawful authority and beyond the scope of his official power. For this reason the petition was not demurrable on the ground that the action was one against the State, which could not be brought without its consent."

In Ware Shoals Mfg. Co. v. Jones, 78 S. C. 211 (58 S. E. 811), the court said: "The distinction seems to be based on the fact that an officer, while attempting to execute an unconstitutional law, is not acting by any authority of the State, and therefore in that identical act is not to be regarded as a State officer. For example, if the tax in question is unlawful, then the comptroller-general in collecting it is not acting for the State; for it would be a contradiction to say that he acts for the State in exacting a tax where not authorized by State law." That an officer charged with the administration of a law alleged to be unconstitutional is not in so acting an officer of the State, and that a suit to enjoin him can not be said to be a suit against the State, is illustrated by the nature of an unconstitutional statute in the eyes of the law. As observed by Mr. Justice Field, in Norton v. Shelby County, 118 U. S. 425 (6 Sup. Ct. 112, 30 L. ed. 178), "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." Where an act is attacked as unconstitutional, and it appears that plaintiff is threatened with irreparable injury to his property by reason of the acts of an officer proceeding under and by virtue of such act, the suit against such officer can not be considered as one against the State, but the court will take jurisdiction of it as a suit against the officer as an individual acting without constitutional authority, and determine the question of the validity of the act. In the present case the State is not a party to the record. No judgment is asked which will take any property of the State, or fasten a lien on it, or interfere with the disposition of funds in its treasury, or compel the State indirectly, by controlling its officers, to affirmatively perform any contract, or to pay any debt, or direct the exercise of any discretion committed to its officers. In view of

what has been said, the petition was not subject to the demurrer setting up that the suit was one against the State.

■ The point is made that the several plaintiffs were not authorized to join in maintaining the action in which the various constitutional attacks were made upon the statute. The decision in *Bohannon* v. *Duncan,* supra, properly placed on common ground, in this respect, dealers, distributors, and consumers, and held that they had such an interest as would authorize them to invoke adjudication on the subject; and thus we are foreclosed against consideration of the question.

■ With reference to the attack which the plaintiffs make on the act, resting upon the complaint that it deprives them of their property without due process of law, in those provisions which require them "to pay illegal exactions called license fees," the case of *Gibbs* v. *Milk Control Board,* supra, seems conclusive in the following statement: "It is apparent on its face that the act is not one levying a tax, but is a health measure within the police power, and is therefore not violative of [art. 7, sec. 2, par. 1], providing that all taxation shall be uniform upon the same class of subjects. The decision in *Woolworth Co.* v. *Harrison,* 172 *Ga.* 179 (156 S. E. 904), has no application to the instant case. The equal-protection clause of the fourteenth amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. . . 'This classification or exemption is not unreasonable, and is therefore not in violation of the fourteenth amendment.' See also State *v.* McKinney, 29 Mont. 375 (74 Pac. 1095, 1 Ann. Cas. 579); *Collier* v. *Atlanta,* 178 *Ga.* 575 (173 S. E. 853); *Melnick* v. *Atlanta,* 147 *Ga.* 525 (94 S. E. 1015)."

■ One of the principal attacks made upon the act is that it provides for an unconstitutional delegation of legislative power, and in this regard violates the due-process clause of the State and Federal constitutions. This attack is directed to section 5, set out in full above, which provides, in substance, that the board shall establish certain natural marketing areas, each area to be known as a milk shed; that upon petition therefor an election shall be held in such milk shed to determine whether or not the provisions of

the act shall be made applicable therein; that each producer, producer-distributor, and distributor, having a municipal or county permit to sell milk within the milk shed, shall be entitled to one vote only; and that if a majority of the votes cast are favorable thereto, the provisions of the act shall be applicable in such milk shed. The constitution of this State confers upon the General Assembly the power to make all laws and ordinances consistent with its provisions, and not repugnant to the constitution of the United States. Art. 3, sec. 7, par. 22 (Code, § 2-1822). While "one of the most important tests as to whether particular laws amount to an invalid delegation of legislative power is found in the completeness of the statute as it appears when it leaves the hands of the legislature" (6 R. C. L. 165), this requirement of completeness does not comprehend that "a legislative act must in any event take effect as law after it leaves the hands of the legislature." 6 R. C. L. 166. It is generally conceded that the legislature may enact a general law complete in its terms, to become operative only upon the happening of a subsequent event, and that this event may be the subject of control by human agencies.

Some authorities deny the power of the legislature to make this event or contingency a majority vote in favor of the act by the people of the State at large. Some of the leading cases upon this subject are: In re Municipal Suffrage to Women, 160 Mass. 586 (36 N. E. 488, 23 L. R. A. 113); Barto v. Himrod, 8 N. Y. 483 (59 Am. D. 506); State v. Hayes, 61 N. H. 264; Brawner v. Supervisors of Elections, 141 Md. 586 (119 Atl. 250); People v. Barnett, 344 Ill. 62 (176 N. E. 108); State v. Parker, 26 Vt. 357; State v. Thompson, 149 Wis. 488 (137 N. W. 20, 43 L. R. A. (N. S.) 339, Ann. Cas. 1913C, 774); State v. Scampini, 77 Vt. 92 (59 Atl. 201); Smith v. Janesville, 26 Wis. 291. The precise question has never been decided in this State, and it need not be decided in the instant case. It is conceded in our State, however, that an act of the legislature is not unconstitutional because by its terms it is to take effect only after it shall have been approved by the vote of the people of the locality affected. Mayor &c. of Brunswick v. Finney, 54 Ga. 317. Laws of a general nature which may by the General Assembly be thought desirable by the inhabitants of certain localities within the State, but undesirable by the inhabitants of other localities, sometimes known as "local option" laws, depend

for their execution and enforcement upon the votes of some portion of the people, and yet are not regarded as delegation of legislative power. *Coleman* v. *Board of Education of Emanuel County,* 131 *Ga.* 643 (63 S. E. 41); *Hines* v. *Etheridge,* 173 *Ga.* 870 (162 S. E. 113). As pointed out in *Southern Railway Co.* v. *Lancaster,* 149 *Ga.* 434 (100 S. E. 380), it has been held in this State that a statute can be enacted by the legislature and its operation be made contingent upon the will of bodies and persons other than the legislature, such as a grand jury. See *Murphey* v. *Educational Board of Burke County,* 71 *Ga.* 856; *Haney* v. *Commissioners of Bartow County,* 91 *Ga.* 770 (18 S. E. 28); *Horne* v. *State,* 170 *Ga.* 638 (153 S. E. 749).

The act now under consideration is complete in its terms as to what the provisions of the law shall be. In this connection, the legislature has exercised its full discretion. The milk board was created immediately upon the passage of the act, its powers and duties fixed. There existed, upon enactment and signature by the Governor, a general milk-control law in this State. It is true that the legislature attached a condition to its becoming operative in any milk shed established by the board, that contingency being that a majority of the votes cast by those who were peculiarly affected by its provisions be in favor of the act; but we do not think that this can be said to be a vesting of authority in this class to make a law, as contemplated and prohibited by any provision of the constitution. The law had been made by the legislature, and their vote in favor of the enactment was merely a condition upon which the law was to go into operation in that area. Those voting can not fix the terms of the law. They, by the necessary majority, may only declare it operative in that particular area. See, in this connection, the second division of the opinion in *Bohannon* v. *Duncan,* supra. The present act, as respects the question now being considered, is strikingly similar to the provisions of the act of Congress known as the tobacco-inspection act of August, 1935, in which it was provided that the Secretary of Agriculture was authorized to designate markets where tobacco was customarily bought and sold at auction, for the purpose of grading tobacco sold therein according to certain standards, but that he was not to designate a market unless two thirds of the growers voting at a prescribed referendum favored it. The act was attacked in *Currin* v. *Wallace,* —— U. S,

—— (decided January 30, 1939), on the ground that the act constituted an unconstitutional delegation of powers. The Supreme Court said, in overruling this attack: "So far as growers of to-bacco are concerned, the required referendum does not involve any delegation of legislative authority. Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two thirds of the growers voting favor it.' Similar conditions are frequently found in police regulations. Cusack Co. v. City of Chicago, 242 U. S. 526, 530 [37 S. Ct. 190, 61 L. ed. 472, L. R. A. 1918A, 136]. This is not a case where a group of producers may make the law and force it upon a minority (see Carter v. Carter Coal Co., 298 U. S. 238 [56 Sup. Ct. 855, 80 L. ed. 1160], or where a prohibition of an inoffensive and legitimate use of property is imposed not by the legislature but by other property owners. (See Washington ex rel. Seattle Trust Co. v. Roberge, 278 U. S. 116, 122 [49 Sup. Ct. 50, 73 L. ed. 210].). Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of those conditions. The distinction was pointed out in Hampton & Company v. U. S., 276 U. S. 394, 397 [48 Sup. Ct. 348, 72 L. ed. 624], where, in sustaining the so-called 'flexible tariff provision' of the act of September 21, 1922, and the authority it conferred upon the President, we said: 'Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an Executive, or, as often happens in matters of State legislation, it may be left to the popular vote of the residents of a district to be affected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the constitution, the condition of its legislation going into effect being made dependent by the legislature on the expression of the voters of a certain district.'" While that decision is not binding authority on this court, it is highly persuasive, and announces, we believe, the true rule, in reference to the present case. Further support may be found for the view that there is no unconstitutional delegation of legislative author-

ity, in the recent case of United States *v.* Rock Royal Co-operative Inc., which upheld certain orders with reference to prices and distribution of milk, entered by the Secretary of Agriculture under the agricultural marketing agreement act of 1937 (50 U. S. Stat. 246).

For a contrary view the case of Eubank *v.* Richmond, 226 U. S. 138 (33 Sup. Ct. 76, 57 L. ed. 156), is relied on. In that case the constitutional attack was based on a violation of the due-process clause and equal-protection clause of the State and Federal constitutions. There the State of Virginia through its General Assembly had passed an act authorizing municipalities "to make regulations concerning the building of houses in a city or town, and in their discretion, . . in particular districts or along particular streets to prescribe and establish building lines," etc. Then, by virtue of this act the city council of Richmond passed an ordinance providing that whenever the owners of two thirds of the property abutting on any street should in writing request the street commission to establish a building line on the side of the street where their property fronted, such building line should be so established, not less than five nor more than thirty feet from the lines of the street. An aggrieved property owner, who was about to be required to make his house or a part of it conform to a building line which had been fixed by a vote of the owners of two thirds of the property on his side of the street, challenged the act and sought to enjoin its enforcement on the grounds hereinabove stated, and it was condemned on those grounds. That case has frequently been cited in support of an attack under the article of the constitution which has to do with the legislative power vested in the General Assembly. If it be viewed in that connection, as argued by plaintiffs in the case below, it may be distinguished from the class of cases into which the present one falls, as was shown in Currin *v.* Wallace, supra, and as pointed out also in Cusack *v.* Chicago, 242 U. S. 532 (supra), because in the Eubanks case two thirds of the property owners were empowered to "fix the building line" and make restrictions which would be operative on the protesting minority. This is altogether different from situations which allow a comprehensive act complete in itself to be put into operation only upon the vote or recommendation of certain groups or agencies. We know of no rule of law or constitutional provision which forbids the selection

by the legislature of groups such as chosen in the present instance, and therefore can not say that the legislature was not authorized to so provide.

■ The further contention is that the act under review offends the due-process and the equal-protection clauses of the State and Federal constitutions, because it is contended that certain legislative findings or determinations declared in the act as to conditions prevailing in the milk industry are untrue. In other words, the plaintiffs in this action contend that unless the conditions recited actually prevailed at the time of the enactment, the act would be manifestly void and violative of these provisions of the constitution, and would not be within the valid exercise of the police power of the State. While it may be said that in the *Bohannon* case, supra, this court has already determined that the regulations of the act, including those which permit the fixing of prices under certain conditions, represent a valid exercise of the police power, on the theory that the milk industry is a business which "for adequate reason" may be subjected to reasonable regulation in order to secure for the public an adequate supply of wholesome and healthful milk, the point is nevertheless made now that in that case the court treated as true the conditions recited in the act as prevailing in the industry, stating that this was done because "we judicially know nothing to the contrary." Therefore it is necessary to consider somewhat further the nature of the act, and to determine whether in the instant case a judicial review of the character sought by plaintiffs may be had as to the conditions prevailing in the milk industry which apparently gave rise to this enactment. The allegations of the petition challenged the truthfulness of the so-called legislative findings and declarations. In the petition were many statements and charges that clearly and directly challenged the truth of all of the important underlying conditions said by the legislature to have been ascertained by it to exist in the milk industry. It is further alleged that "said act was enacted by the General Assembly without an investigation, legislative or otherwise, into conditions then existing in said milk industry, and without any public committee hearing in either house of said assembly." It is earnestly contended by their counsel that they are entitled, on such a challenge, to have the issues as to the truthfulness of these recitals determined in the present suit, and that evidence be

heard on the questions made. The defendants, on the other hand, assert that these legislative findings must be treated by the courts as conclusive. They further urge that the act would be perfectly good as a valid exercise of the police power, without regard to the actual truth of the legislative findings upon which the act seems to have been predicated.

While it can not be said that the General Assembly may legislate facts into existence, their declaration and determination of facts and conditions, when solemnized by enactment and approved by the Executive, are generally held to be beyond the reach of judicial inquiry, where the right to enact such legislation is dependent upon the facts so recited, and provided such act does not impair or destroy purely private rights. We have had some cases which held in substance that recitals of fact in a public statute were not conclusive on the courts, and that persons whose rights were affected by the attempt to establish such facts could require, in the courts, that evidence be heard as to their truth or falsity. Typical of these cases are *Dougherty* v. *Bethune, 7 Ga.* 90; *Beall* v. *Beall, 8 Ga.* 210; *Thornton* v. *Lane, 11 Ga.* 459. An examination of these cases will show, however, that the enactment there dealt with had to do with specific individual rights of particular persons, and were not in any true sense general laws affecting the whole public. To illustrate the character of this type of case, it may be noted that in *Thornton* v. *Lane,* supra, the case involved the right of a party to attack a judgment against one who had been declared by the act in question to be the assignee of a particular bank. In *Bachlott* v. *Buie,* 158 *Ga.* 705, 711 (124 S. E. 339), in speaking of how the courts would deal with another class of public statutes affecting either the whole State or a distinct group of people, Mr. Justice Hines, for the court, stated: "This court announced the doctrine that when the right to enact the law depends upon the existence of facts, it is the duty of the legislature before passing the bill, and of the Governor before approving it, to become satisfied in some appropriate way that the facts exist; but no authority is conferred upon the courts to hear evidence and determine as a question of fact whether these constitutional departments of the State government have properly discharged such duty." It is appropriate to say that the foregoing statement was made to apply to a situation where the power of the legislature to enact was dependent upon the ascertainment of certain facts.

It would be interesting, but we think unnecessary, in the instant case, to determine how far the courts may go, and what processes they might employ to review legislative findings of fact upon which the General Assembly may decide to enact certain legislation. We think it is sufficient now to say that the general rule which would usually be applied is that found stated in 6 R. C. L. § 112, as follows: "The constitutionality of a law is not to be determined on a question of fact to be ascertained by the court. If under any possible state of facts an act would be constitutional, the courts are bound to presume that such facts exist; and therefore the courts will not make a separate investigation of the facts, or attempt to decide whether the legislature has reached a correct conclusion with respect to them. Accordingly the validity of an enactment can not be made to depend on the facts found on the trial of the first case involving the validity of such a statute. If the rule were otherwise, the trial of the main issue would necessarily be delayed until the preliminary fact on which the validity of the contested legislative act depended should be first tried and determined on testimony; and since this testimony might be different in different cases, there would be involved an absurdity of declaring the law constitutional one day and unconstitutional the next." But it may be broadly stated that in the process of enactment of all statutes the legislature exercises its judgment as to the appropriateness or necessity of its own legislation, and thus determines the end to be achieved for the public good and selects the instrumentality to accomplish this objective. The only requirement by which the General Assembly is bound, in its exercise of the police power of the State, is that in selecting the instrumentality to achieve a legitimate end it must choose a means or an agency or a method that is of a nature reasonably suited or adapted to accomplish the purpose. The regulation must not be arbitrary, and must not be capriciously founded. "The validity of legislation which would be necessary or proper under a given state of facts does not depend on the actual existence of the supposed facts. It is enough if the lawmaking body may rationally believe such facts to be established. Under the American system of government by the people through their chosen representatives, practical legislation admits of no other standard of action. The fact that the finding of the legislature is in favor of the truth of one side of a matter as to which there is still room for difference of opinion is not material." 6 R. C. L. § 112.

Each department of the Government is supreme in its own field, and must be allowed full freedom for the exercise of its separate functions until it transcends the bounds fixed by the constitution. The General Assembly is a representative body, representing the people of the whole State by their selection; and in the particular instance of the enactment now under review they concluded, for reasons satisfactory to themselves, that certain conditions existed which called for extensive regulation, including that of price control under certain circumstances. It is true that they have predicated it on a so-called emergency, and have determined that it may be of at least five years duration. We can not say, from anything of which we may take judicial notice, that conditions appropriate for such public regulations did not or do not exist; nor may we assume, if these conditions said by the General Assembly to exist should be cured or cease to exist, that the Assembly will not itself so determine and repeal this remedy chosen by it. The Supreme Court of the United States, in dealing with a case which questioned the validity of a statute of Pennsylvania relating to the manufacture and sale of what is commonly called oleomargarine butter, gave to us through Mr. Justice Harlan the following treatment of this general subject, in Powell v. Penn., 127 U. S. 678, 680 (9 Sup. Ct. 992, 32 L. ed. 253) : "Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts. It is not a part of their functions to conduct investigations of facts entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in statutes, as they may happen to approve or disapprove its determination of such questions. The power which the legislature has

to promote the general welfare is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large. While both its power and its discretion must be so exercised as not to impair the fundamental rights of life, liberty, and property, and while, according to the principles upon which our institutions rest, 'the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself,' yet, 'in many cases of mere administration, the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of public opinion or by means of the suffrage.' Yick Wo v. Hopkins, 118 U. S. 370 [6 Sup. Ct. 1064, 30 L. ed. 220]. The case before us belongs to the latter class. The legislature of Pennsylvania, upon the fullest investigation, as we must conclusively presume, and upon reasonable grounds, as must be assumed from the record, has determined that the prohibition of the sale, or offering for sale, or having in possession to sell, for purposes of food, of any article manufactured out of oleaginous substances or compounds other than those produced from unadulterated milk or cream from unadulterated milk, to take the place of butter produced from unadulterated milk or cream from unadulterated milk, will promote the public health, and prevent frauds in the sale of such articles. If all that can be said of this legislation is that it is unwise, or unnecessarily oppressive to those manufacturing or selling wholesome oleomargarine as an article of food, their appeal must be to the legislature, or to the ballot-box, not to the judiciary. The latter can not interfere without usurping powers committed to another department of government."

There have been instances where the United States Supreme Court has declined to pass on the constitutionality of legislative enactments upon demurrer and before ascertainment of factual conditions. Such was the case of Bordens v. Baldwin, 293 U. S. 194 (55 Sup. Ct. 187, 79 L. ed. 281). See, in this connection, Borden's Co. v. Ten Eyck, 297 U. S. 251, 263 (56 Sup. Ct. 453, 80 L. ed. 669); Standard Oil Co. v. Marysville, 279 U. S. 582 (49 Sup. Ct. 430, 73 L. ed. 856). In Borden's Co. v. Ten Eyck, supra, we find the following statement: "Judicial inquiry does not concern itself

with the accuracy of the legislative finding, but only with the question of whether it so lacks any reasonable basis as to be arbitrary." In Mutual Building & Loan Asso. *v.* Moore, 232 Ala. 488 (169 So. 1), the court was dealing with the question whether or not an emergency existed such as to authorize the enactment or continuance of certain legislation modifying the State law in reference to mortgage foreclosures, and establishing something in the nature of a moratorium for their enforcement. The validity of that statute, according to the construction given it by the Alabama Supreme Court, was clearly dependent upon the question of whether there was in fact an emergency. On the question of judicial inquiry, Mr. Justice Foster pointed out that since its operation is dependent upon an emergency, if a litigant wishes to attack it on the ground that no emergency exists he may do so by demurrer, and in this connection said: "At law issues of fact in pleading are made by a traverse or a confession and avoidance, such as by pleas, replications, etc., and issues of law are made by demurrer. When a demurrer alleges facts which do not otherwise appear in the pleading, it is a speaking demurrer and should not be considered on the basis of those facts. Webb *v.* J. R. Lowe & Co., 215 Ala. 552 (112 So. 138); 49 C. J. 423, sec. 536. But it may be predicated upon that which is judicially known, without asserting the fact to exist, but treat it as existing. Since there was no demurrer to the plea on a ground which raised the question of the emergency, and no argument is made on the basis of an absence of it, we must review the ruling of the court on the demurrer upon the assumption that the emergency as declared by the act to exist, did then in fact exist, and continued until the ruling was made."

While, as seen from the foregoing, the view has often been expressed that, in making judicial review of legislative ascertainment of fact, resort should be had only to those things of which the court may take judicial cognizance, and that the judicial inquiry should be thus limited, we do not desire here to so mark the boundaries of judicial inquiry, but rather to say that if we may, from resort to judicial knowledge, discover that the legislature *may* have found conditions to exist which would warrant the use of the remedy adopted, we shall consider it their province to do so, and shall presume they did in fact so find; and this would be true whether or not the act contained recitals of their findings. Legislative recitals

of fact and conditions which give rise to their enactment are not new in our State. They are found in many of the earlier acts, but usually the courts have had occasion to deal with them only as in aid of judicial interpretation. The legislature in the act here under consideration has found, among other things, that the prices at which milk may be sold and which may be paid to the man who owns the cows, and to the man who as a middleman distributes to consumers, play an important and vital part in finally providing for the public an adequate supply of milk of true and proper content. If we may judicially know, and from the source of common report and common knowledge discover, that this *may* be true, it should be treated as correct by us in dealing with the main question at hand. We recognize that many arguments may be advanced on both sides of the subject, and we do not wish or think it appropriate to enter into any discussion of economics; but we may very well look to current writings and to what has been said in the various discussions of the courts, where public and legislative investigations have been reported and reviewed, for enlightenment on this question. We may also resort to our own knowledge of what goes on in commerce and industry as common practice, and to the various factors that may enter into the operation of dairies and the production, marketing, and consumption of milk. We do think it is a matter of easy observation that in the distribution of milk, especially in areas of congested population, one of the principal financial investments in dairies or milk distributing plants is that which goes to provide for sanitation and to insure the proper treatment of the product to preverve it in a healthful condition and keep it nutritious. So, whether there was an unusual production or supply of the product or not, if persons sought in large numbers to sell it without those precautions to insure the health of the customers, they could do so at much lower prices than those who are required to protect its quality and healthful condition; and this condition would tend to destroy the adequacy and the source of supply of the product of pure and wholesome content to the general public. The price is therefore a means, and not an end. The act as a whole (Ga. L. 1937, p. 260) seems to be designed, not to secure the greater or less price, but to secure an adequate supply of wholesome milk; and if the price be one of the appropriate means, we can not condemn it, and the cases which have so held must have our approval.

Legislation similar to the Georgia law now under review has been enacted by a majority of the States. A review of these several statutes and their history under attack through the courts may be found in 22 Minnesota Law Review, 809, in a compilation and discussion. They have been largely uniform, and for the most part contain the same or closely similar provisions to those in the first act reviewed in the United States Supreme Court in Nebbia v. New York, 291 U. S. 502 (54 Sup. Ct. 505, 78 L. ed. 940). Since then that court has upheld a similar act of the State of Virginia, as against the claim of violation of the fourteenth amendment. Highland Farms v. Agnew, 300 U. S. 608; 617 (57 Sup. Ct. 549, 81 L. ed. 835). See also State court decisions involving the constitutionality of acts similar to that here under review: Miami Home Milk Producers Asso. v. Milk Control Board (1936), 124 Fla. 797 (169 So. 541); Logan v. Alfredi (1933), 110 Fla. 439 (148 So. 872); Franklin v. State ex rel. Alabama Milk Control Board (1936), 232 Ala. 637 (169 So. 295); Albert v. Milk Control Board (1936), 210 Ind. 283 (200 N. E. 688); State Board of Milk Control v. Richman Ice Cream Co. (1934), 117 N. J. Eq. 296 (175 Atl. 796); State ex rel. State Board of Milk Control v. Newark Milk Co. (1933), 118 N. J. Eq. 504 (179 Atl. 116); Rohrer v. Milk Control Board (1936), 332 Pa. 257 (186 Atl. 336); State ex rel. Finnegan v. Lincoln Dairy Co. (1936), 221 Wis. 1 (265 N. W. 197, 851). Again, as recently as June 5, 1939, in United States v. Rock Royal Cooperative Inc., and other cases decided in the same opinion, the United States Supreme Court, in dealing with the constitutionality of an act regulating the production and distribution of milk under the commerce clause of the constitution, made the following statement on the same general subject: "The power of a State to fix the price of milk has been adjudicated by this court. The people of great cities depend largely upon an adequate supply of pure fresh milk. So essential is it for health that the consumer has been willing to forego unrestricted competition from low-cost territory, to be assured of the producer's compliance with sanitary requirements, as enforced by the municipal health authorities. It belongs to that category of commodities that for many years has been subjected to the regulatory power of the State."

In the various States and in the United States Supreme Court all of the attacks have been made that are here made; and finally,

for the most part, the acts have been upheld on the general principle to which we have felt constrained to adhere, that the police power of the State extends to a reasonable regulation of the milk industry in order to assure to the public an adequate supply of wholesome, healthful milk; and that the legislature shall judge of the necessity and the nature of these regulations so long as they are not arbitrary in nature or capriciously founded. The majority opinion in the Nebbia case, supra, was largely predicated on the holding in Munn v. Illinois, 94 U. S. 112, 133 (24 L. ed. 77), and German Alliance Ins. Co. v. Lewis, 233 U. S. 389 (34 Sup. Ct. 612, 47 L. ed. 434, L. R. A. 1915C, 1189). In the Munn case, which dealt with the power of the Illinois assembly to fix by law minimum charges to be made for the storage of grain in warehouses in that State, Mr. Chief Justice Waite, delivering the opinion of the court, and in referring specifically to the power to fix prices or establish a minimum and maximum, reasoned as follows: "In countries where the common law prevails, it has been customary from time immemorial for the legislature to declare what shall be a reasonable compensation under such circumstances, or, perhaps more properly speaking, to fix a maximum beyond which any charge made would be unreasonable. Undoubtedly, in mere private contracts relating to matters in which the public has no interest, what is reasonable must be ascertained judicially. But this is because the legislature has no control over such a contract. So, too, in matters which do affect the public interest, and as to which legislative control may be exercised, if there are no statutory regulations upon the subject, the courts must determine what is reasonable. The controlling fact is the power to regulate at all. If that exists, the right to establish the maximum of charge, as one of the means of regulation, is implied. In fact the common-law rule, which requires the charge to be reasonable, is itself a regulation as to price. Without it the owner could make his rates at will, and compel the public to yield to his terms, or forego the use. But a mere common-law regulation of trade or business may be changed by statute. A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law can not be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even

at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. To limit the rate of charge for services rendered in a public employment, or for the use of property in which the public has an interest, is only changing a regulation which existed before. It establishes no new principle in the law, but only gives a new effect to an old one. We know that this is a power which may be abused; but that is no argument against its existence. For protection against abuses by legislatures the people must resort to the polls, not to the courts." See Budd *v.* New York, 143 U. S. 517 (12 Sup. Ct. 468, 36 L. ed. 247); Brass *v.* North Dakota, 153 U. S. 391 (14 Sup. Ct. 857, 38 L. ed. 757); German Alliance Ins. Co. *v.* Lewis, supra; O'Gorman *v.* Hartford Ins. Co., 282 U. S. 251 (51 Sup. Ct. 130, 58 L. ed. 1011); Nebbia *v.* New York, supra; West Coast Hotel Co. *v.* Parrish, 300 U. S. 379 (57 Sup. Ct. 578, 81 L. ed. 703); Townsend *v.* Yeomans, 301 U. S. 441 (57 Sup. Ct. 842, 83 L. ed. 415).

If it be conceded, as it is, that our General Assembly under the constitutional limitations may *regulate* the milk industry for the general welfare and public good, in order to insure to the public an adequate supply of wholesome and healthful milk, a product of food essential for human consumption and particularly susceptible to carrying germs of disease as well as to adulteration, then the main inquiry on the price-fixing question is whether the prices at which this product may be sold in free and unrestrained competition ordinarily enjoyed by persons and businesses ordinarily immune from restraint may, in a material way, affect or influence this "adequate supply." We have practically stated so, or taken for granted such was the case in *Bohannon* v. *Duncan,* supra. We hold that the act does not offend the provisions of the constitution pointed out. The court erred in overruling the general demurrer.

*Judgment reversed. All the Justices concur, except Atkinson, P. J., and Duckworth, J., who dissent.*

ATKINSON, Presiding Justice, dissenting. It is recognized that as a health measure reasonable regulations may be enacted by the legislature, applying to sale and distribution of milk under the police power of the State. The milk-control act in question undertakes in part to do that thing. As a means of regulation section 19

of the act provides substantially that the board shall fix a price at which wholesome milk may be sold, and penalizes sale at higher or lower prices. It thus takes from the seller and purchaser the right to agree upon the price of their choice, if it be different from that fixed by the board. Agreement as to price is essentially a part of the contract. The right to contract is a property right which is protected by the due-process clauses of our State and Federal constitutions, which can not be abridged by mere legislative act. The legislative power of the General Assembly is very broad, but is not above the constitution. The police power of the State, exercisable by the General Assembly, is very broad, but not above the constitution. See *Cutsinger* v. *Atlanta*, 142 *Ga.* 555 (3), 571 (83 S. E. 263, L. R. A. 1915B, 1097, Ann. Cas. 1916C, 280); *Carey* v. *Atlanta*, 143 *Ga.* 192 (3), 201 (84 S. E. 456, L. R. A. 1915D, 684, Ann. Cas. 1916E, 1151), and cases cited in dissenting opinion in Nebbia *v.* New York, 291 U. S. 502 (supra). To allow abridgment of the right of individuals to contract for sale of wholesome milk, by taking from them the right to agree upon the price, would be to put legislation, whether enacted in exercise of claimed general or police power of the legislature, above the constitution. In this view so much of the act in question as attempts to fix the price at which wholesome milk may be sold is void as violative of the due-process clauses of State and Federal constitutions. This applies whether the fixing of price by legislative act is considered alone or in connection with a general plan to regulate sale of milk. What is said does not overlook the greater number of decisions in other jurisdictions, not binding upon this court, which take a different view, as cited in the majority opinion. There are expressions seemingly to the contrary in *Bohannon* v. *Duncan*, 185 *Ga.* 840 (supra), to which the writer assented; but the judgment in that case, not having been concurred in by all the Justices, is not binding on this court as a precedent; and so far as it may conflict with the views above expressed, the decision should not be followed. The writer recedes from the view then expressed, relating to fixing of price. While not material argument on the constitutional question, it is not entirely out of place to note that if the General Assembly could constitutionally fix the price at which wholesome milk must be sold, as provided in this act, it could constitutionally prevent an owner of one cow from giving or selling wholesome milk to his neighbor. Mr. Justice Duckworth concurs in this dissent.